893 So.2d 809 (2005)
LOUISIANA MUNICIPAL ASSOCIATION, the Parish of Jefferson, Louisiana, et al.
v.
The STATE of Louisiana and the Firefighters' Retirement System.
No. 2004-CA-0227.
Supreme Court of Louisiana.
January 19, 2005.
Rehearing Denied February 25, 2005.
*814 Charles C. Foti, Jr., Attorney General, Tina Vicari Grant, Roy Achille Mongrue, Jr., Assistant Attorneys General, Steven Scott Stockstill, Baton Rouge, Counsel for Applicant.
Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P., Charles S. McCowan, Jr., Charles Leonard Patin, Jr., Shannan Sweeney Rieger, Baton Rouge, Simoneaux, Carleton, Dunlap & Olinde, LLC, Henry Dupont Heck Olinde, Jr., Barbara Irwin Messina, Baton Rouge, Jay Jones Harris, Counsel for Respondent.
TRAYLOR, Justice.[*]
The issue in this case is whether the statutory funding structure of the Firefighters' Retirement System ("FRS") violates the requirements of the Louisiana Constitution. Plaintiffs[1] are local government *815 employers whose firefighter employees are members of the FRS. Plaintiffs filed suit against the State of Louisiana ("State") and the FRS seeking: (1) a declaration that the employers' contribution rate to the retirement system was statutorily fixed at 9% and (2) an injunction preventing the State and the FRS from obtaining or demanding from the employers more than 9% as the rate of their contribution to the retirement system.
This case is before the court as a direct appeal, pursuant to La. Const. art. 5, ง 5(D), based on the fact that the district court declared La. R.S. 11:103 and La. R.S. 11:104 unconstitutional as applied to the FRS in its judgment, along with several legislative acts which have effected changes in the statutory funding structure of the FRS.[2] The district court's judgment also permanently enjoined the FRS from collecting more than a contribution rate of 9% from an employer whose employees are members of the FRS. After a thorough review of the record, and the statutory and constitutional provisions at issue, we affirm in part, reverse in part and order that the permanent injunction issued against the FRS be lifted.

HISTORICAL BACKGROUND
Before the legal analysis of the various acts and constitutional provisions of this complex subject matter is presented, it is necessary to provide a history of the creation of the FRS, the state's response to a subsequent fiscal crisis, and the effect of certain statutory amendments affecting the FRS, in order to understand the legal analysis in context.

Creation of the FRS
The FRS was created by the legislature pursuant to Acts 1979, No. 434, ง 1, consisting of La. R.S. 33:2151 through La. R.S. 33:2165, effective January 1, 1980. The FRS was established to provide retirement allowances and other benefits to firefighters employed by any municipality, parish or fire protection district in the state.[3]
The FRS is administered through a board of trustees whose members are designated by the legislature.[4] The board members are authorized by the legislature to designate an actuary who serves as the technical advisor to the board of trustees regarding the operation of the FRS.[5] The legislature placed the *816 FRS and its board of trustees in the Department of the Treasury.[6]
The FRS is a defined benefit plan.[7] In other words, the benefits to which an employee is entitled upon retirement are defined, in this case by statute, and the participant can depend upon that value upon retirement.[8] The FRS is not a defined contribution plan. In a defined contribution plan, the contributing parties, typically the employer and employee, contribute fixed amounts to the plan, and at the time of retirement, the participant in the plan receives the accumulated balance in the account.[9]
The FRS has three main sources of funding: (1) employee contributions, (2) employer contributions and (3) dedicated tax revenues from the state.[10] These FRS assets are credited to one of five sub-funds which comprise the retirement system.[11] Only two of the five sub-funds are important to this analysis.[12]

Employee Contributions
The legislature provided that the employees' contributions are to be accumulated in the Annuity savings fund.[13] For all but a brief period since its inception, the FRS rate of contribution for employees has been statutorily set at 8% of salary excluding overtime.[14] These contributions are accumulated by the firefighters' employers through payroll deductions and provided to the FRS.[15]

Employer Contributions
The legislature provided that the firefighters' employers' contributions are to be *817 accumulated in the Pension accumulation fund.[16] As originally conceived, employers were to pay into this sub-fund the amount of 9% of payroll, excluding overtime but including state supplemental pay, and to remit this amount monthly to the FRS. In addition, employers were also responsible for contributing to the FRS an amount known as the "normal contribution rate," which was to be determined by the actuary after calculation of the liabilities of the system, mortality rates, interest and other variables.[17]

Dedicated Tax Revenues
The legislature provided the third main source of funding for the FRS by dedicating to the FRS tax revenues collected through assessments against insurers conducting business in the state. Prior to the creation of the FRS, the legislature created the Louisiana Insurance Rating Commission ("Commission") in La. R.S. 22:1401 et seq. Section 2 of Acts 1979, No. 434 amended La. R.S. 22:1419 to provide for a specific dedication of tax revenue for the benefit of the FRS derived from assessments against insurers conducting business in the state which were collected in the Insurance Premium Tax Fund ("IPTF").[18] The legislature dedicated to *818 the FRS funds from the IPTF calculated as "an amount equal to two-tenths of one percent of the gross direct premiums received in this state, in the preceding year, by insurers doing business in this state and subject to this Part, less returned premiums...."[19] In the same legislation, the legislature dedicated four-tenths of one percent of the IPTF to the Municipal Police Employees' Retirement System and one-tenth of one percent of the IPTF to the Sheriffs' Pension and Relief Fund.[20]
IPTF funds are placed into the Pension accumulation sub-fund of the FRS.[21] Thus, the gross or total "employers' contribution" in the Pension accumulation sub-fund is made up of the contribution directly obtained from the employers and the dedicated tax revenue from the IPTF.

State Guarantee
In addition to providing for the structure and funding of the FRS, Acts 1979, No. 434 provided that the state would guarantee the payment of retirement benefits to members of the FRS. La. R.S. 33:2165 (1980) provided: "[t]he state of Louisiana hereby guarantees benefits payable to a member of this system or a retiree or to his lawful beneficiary upon his death."

The State Fiscal Crisis

Constitutional Changes
In the late 1980's, Louisiana faced a cash flow crisis brought on, in part, by the worldwide collapse of oil prices and an inability of the state to borrow funds. See Strickland v. State Through Off. Of Gov., 534 So.2d 956 (La.1988). In order to ensure the financial soundness of the state and statewide public retirement systems, the legislature proposed amending the state's constitution regarding retirement and retirement benefits.
Pursuant to Acts 1987, No. 947, ง 2, the proposal to add paragraph (E) to La. Const. art. 10, ง 29 was submitted to the electors of the State of Louisiana and was ratified by them on November 21, 1987. See La. Const. art. 10, ง 29, "Historical Notes." This section of the state constitution became effective on December 24, 1987. Id.
La. Const. art. 10, ง 29(E)(1) requires that the state and statewide retirement systems[22] attain and maintain actuarial *819 soundness and that the legislature establish the particular method of actuarial valuation to be employed by each state and statewide retirement system for doing so. Subsection (E)(2) provides constitutional requirements for public retirement systems whose benefits are guaranteed by the state.[23] Subsection (E)(3) requires that, for all statewide public retirement systems whose benefits are not guaranteed by the state, the legislature must determine all required contributions to be made by members, employers and dedicated taxes for the sound actuarial maintenance of the systems. In addition, this subpart requires the elimination of unfunded accrued liability in these retirement systems by the year 2029, commencing with Fiscal Year 1989-1990. Subsection (E)(4) prohibits the state and the governing authorities of the state and statewide public retirement systems from taking any action that would cause the actuarial present value of expected future expenditures of the retirement system to exceed or further exceed the sum of the current actuarial value of assets and the actuarial present value of expected future contributions to the retirement system, except with respect to normal business operating expenses, capital outlay expenditures, management of investments, and cost of living increases as provided by law. Subsection (E)(5) mandates that all funds of the state and statewide public retirement systems are used for the purposes of the retirement systems and cannot be encumbered or diverted to any other purpose. This subpart prohibits the diminishment or impairment of the accrued benefits of the members of the state and statewide public retirement systems and provides that future benefit provisions shall only be altered by legislative enactment.[24]
*820 At the time that Section (E) became effective, the FRS was a state guaranteed retirement system pursuant to La. R.S. 33:2165 (1980).

Statutory Changes: Acts 1988, No. 81

Title 11: Chapter 1
In the year following the adoption of La. Const. art. 10, ง 29(E), the legislature enacted Title 11, to be comprised of La. R.S. 11:1 through La. R.S. 11:127, and known as the "Louisiana Public Retirement Law."[25] In Title 11, the legislature began the process of consolidating the law regarding public retirement systems in order to comply with the constitutional mandate provided in La. Const. art. 10, ง 29(E) that public retirement systems be maintained on a sound actuarial basis.[26]
The legislature recognized that such a consolidation could not be accomplished in a single act, but that such a process would proceed over a period of time.[27] Consequently, the legislature was aware of the need for the new provisions of Title 11 to be understood in conjunction with existing public retirement legislation. The legislature provided a mechanism for the harmonization of the new and existing public retirement law in Chapter 1 of the legislation enacting Title 11, to be designated as La. R.S. 11:3, as follows:
Except as is specifically otherwise provided, the provisions of this Title do not repeal comparable provisions contained within separate laws governing state and statewide public retirement systems. However, the provisions of this Title shall be controlling in case of conflict with the separate laws. The separate laws shall continue to be operable to the extent they are not in conflict with the provisions of this Title.[28]
Thus, existing law was to be followed except where it conflicted with the provisions of Title 11.

Title 11: Chapter 2
The legislature understood that the consolidation of public retirement systems would be an on-going process. Chapter 2 of Title 11, entitled "Required Contributions," was designated by the legislature "as a depositary for legislation involved in a continuing process of consolidation of law relative to required contributions to public retirement systems to achieve and maintain those systems on a sound actuarial basis."[29]
*821 In Chapter 2 of Title 11, the legislature enacted statutes responding to the constitutional requirements in La. Const. art. 10, ง 29(E). The legislature established in La. R.S. 11:22 the distinct method of actuarial valuation which each state and statewide retirement system must use to comply with the constitutional mandate in La. Const. art. 10, ง 29(E)(1).[30] The legislature established in La. R.S. 11:42 the method for amortization of unfunded accrued liabilities for each of the state and statewide retirement systems in compliance with the constitutional mandate in La. Const. art. 10, ง 29(E)(2)(c) and (3).[31] To comply with the constitutional mandate of La. Const. art. 10, ง 29(E)(2)(a) and (3), that the legislature determine and set all required contributions to be made by members of state and statewide public retirement systems, the legislature in La. R.S. 11:62 established employee contribution rates.[32] To comply with La. Const. art. 10, ง 29(E)(3), the legislature established ad valorem tax contributions in La. R.S. 11:82 for those public retirement systems, not including the FRS, which have that type of tax as a funding source.
In compliance with La. Const. art. 10, ง 29(E)(2)(b), (c) and (3), the legislature provided a multi-level formula to determine the rate of employer contributions in La. R.S. 11:102, applicable to public retirement systems in which the benefits are guaranteed by the state, and in La. R.S. 11:103, applicable to public retirement systems in which the benefits are not guaranteed by the state.[33] Each statute provides a general formula whereby the systems' actuaries calculate annually the amount of the employers' contribution after taking into account the normal costs of the retirement system, the known amount of the employees' contributions, the assets within the system, the expected return on investments, and the projected liabilities of the system, including payment of unfunded accrued liabilities over time. This calculation must be performed annually by the actuaries so that changes in any of the variables of the system may be addressed promptly. In this formula, the "known" variables are calculated with the projected or actuarially determined variables to stabilize the formula and, thus, achieve actuarial soundness.
In La. R.S. 11:102,[34] in state guaranteed systems, the actuarially required *822 employer contribution rate, as determined by the formula in Paragraph (B)(3), *823 is annually compared with the employer contributions actually received.[35] If the employer contributions actually received are less than those required by the actuary, then the governing authority of the retirement system is authorized to present to the state treasurer a warrant for the amount needed to make up the difference, and the amount is paid by the state treasurer from the state general fund.[36] The fact that any shortfalls in the actuarial computation are the direct responsibility of the state itself is a defining feature of a state-guaranteed public retirement system.[37]
The legislature enacted a similar formula in La. R.S. 11:103 to annually determine the rate of employer contributions for the public retirement systems whose benefits are not guaranteed by the state.[38] In R.S. *824 R.S. 11:103, however, the difference between the actuarially required employer contributions and the employer contributions actually received are determined to be that fiscal year's short fall amount.[39] That short fall amount is then included in the succeeding fiscal year's calculation as an amount to be amortized over a period of five years.[40]

Title 11: Chapter 3
The legislature understood that it would need an entity to coordinate the ongoing process of consolidation of the public retirement law and to implement the strategies created for achieving actuarial soundness of the state and statewide public retirement systems. In Chapter 3 of Title 11, designated as La. R.S. 11:121-127, the legislature created the Public Retirement Systems' Actuarial Committee (PRSAC) within the Department of the Treasury, effective July 1, 1988.[41] The legislature articulated the purpose of Chapter 3 in La. R.S. 11:121(B)(1998), as follows:
The legislature recognizes that the fiscal integrity of the state and statewide retirement systems and pension plans or funds is a priority and is necessitated by the current financial condition of the systems, plans, or funds. This actuarial committee is created with the intent that a plan can be developed to insure orderly and consistent strategies for continuing development and growth that will attain and maintain the soundness of the systems, plans, or funds. The purpose of this Subpart is to provide an entity to advise and coordinate this ongoing process and to advise the Joint Legislative Retirement Committee of all findings and recommendations.[42]
The duties of the PRSAC are described in La. R.S. 11:127(A)(1988), as follows:
The committee shall review and study, on a continuing basis, actuarial assumptions, funding methods, and unfunded liability determined by those methods, the amortization methods to reduce such unfunded liability, and such other matters as the committee deems appropriate. It shall make recommendations, subject to the unanimous approval of the *825 committee, to the retirement systems, plans, or funds and to the Joint Legislative Retirement Committee.[43]
In La. R.S. 11:127(B) (1988), the legislature further ordered the PRSAC to adopt, each year, an official valuation of each state and statewide public retirement system. This valuation is to be derived and revised only as authorized by the statute setting forth the duties of PRSAC.[44] The mechanism by which the valuations of the state and statewide public retirement systems are to be made is further described in La. R.S. 11:127(C) (1988), as follows:
The actuaries for the public retirement systems, plans or funds and the legislative actuary shall submit annual actuarial valuations to the committee. The committee shall review and analyze all the assumptions and valuations submitted. The committee shall be [sic; by] unanimous consent approve a single valuation for each public retirement system, plan or fund. Once unanimous consent is obtained by the committee the actuarial valuations in the form of the official valuations adopted by the committee, shall be submitted to the Joint Legislative Retirement Committee and the Joint Legislative Committee on the Budget for introduction into the state budget.[45]

Legislative Amendments Effecting the FRS
There are four categories of amendments to various statutes regarding the FRS which are important to an understanding of the issues presented.

1. FRS Consolidated Into Title 11
In connection with the on-going process of consolidation of the state and statewide public retirement systems, the legislature by Acts 1991, No. 74, authorized the Louisiana State Law Institute to re-designate all of the existing provisions of law related to and governing the operation of the public retirement systems, plans, and funds.[46] This Act consolidated into Title 11 the four main state retirement systems[47] and the nine statewide retirement *826 systems.[48] In this manner, the statutory provisions relative to the FRS, former La. R.S. 33:2151 through 2165, were re-designated in Title 11 as La. R.S. 11:2251 through 2269.[49] Specifically, the provisions of La. R.S. 33:2160, which set up the method of funding the FRS, were re-designated as La. R.S. 11:2262. Within this Act, the legislature clearly expressed its intent that the re-designation did not alter substantive law: "No action taken by the Louisiana State Law Institute under the provisions of this Act shall in any way alter or repeal any substantive provision of law governing any public retirement system, plan or fund."[50] These changes became effective on June 25, 1991.[51]

2. State Guarantee Repealed
The legislature repealed former La. R.S. 33:2165 in its entirety pursuant to Acts 1991, No. 645, effective July 1, 1991. This Act repealed the state guarantee of benefits to FRS members and their beneficiaries.[52] After the effective date of this act, the formula described in La. R.S. 11:103, applicable to public retirement systems whose benefits were not guaranteed by the state, and not the formula in La. R.S. 11:102, applicable to state guaranteed systems, was used for the calculation of the employer contributions to the retirement system. The Act also repealed former La. R.S. 36:769(D)(8), which had transferred the FRS to the Department of the Treasury.

3. Calculation of Employer Contribution

A. Acts 1991, No. 397
Pursuant to Acts 1991, No. 397, ง 3, effective July 1, 1991, the legislature enacted La. R.S. 11:103(C).[53] In Paragraph (C), *827 the legislature provided a formula for the calculation of the net direct actuarially required employer contribution rate. The formula provided in La. R.S. 11:103 is a multi-level formula. The formula calculates, inter alia: (1) the employer contribution rate; (2) the actuarially required employer contribution rate; and (3) the net direct actuarially required employer contribution.[54]
With this amendment, the legislature established that the net direct actuarially required employer contribution rate would be determined by taking the fixed portion of the net direct employer's contribution, 9% in the case of the FRS; adding the elements of cost in the gross required employer contribution for that fiscal year (using the retirement's system's statutorily-specified actuarial funding method and taking into account such factors as the value of employee contributions and interest); and subtracting the elements of the gross employer contributions, which, in the case of the FRS, includes the fixed 9% and the dedicated IPTF funds.[55] This formula reveals that the net direct actuarially required employer contribution consists of both the fixed portion of the employer's contribution, if any, along with any amount determined after application of the calculation.

B. Acts 1991, No. 1038
Pursuant to Acts 1991, No. 1038, effective September 6, 1991, the legislature, inter alia, enacted La. R.S. 11:104 to provide with respect to the determination and reporting of employer contribution rates.[56] *828 According to La. R.S. 11:104, the PRSAC shall determine the employer contribution rate by a certain date. Within ten business days thereafter, the chairman of the PRSAC must notify each employer or retirement system that the employer contribution rate so determined will be either recommended to the legislature for approval, or that the given rate must be used by the employer or retirement system, whichever is appropriate under La. R.S. 11:102 or La. R.S. 11:103. La. R.S. 11:103 is applicable to the FRS as a statewide public retirement system whose benefits are not guaranteed by the state. Thus, the employer contribution rate reached after computation of the formula by the PRSAC is the rate which must be paid by the employer to the retirement system.

C. Acts 1997, No. 792
Pursuant to Acts 1997, No. 792, the legislature amended La. R.S. 11:103(B)(1) and (3)(a) and (C)(1).[57] These three changes made adjustments to the formula used to determine the employer contribution rate for statewide public retirement systems whose benefits are not guaranteed by the state by amending some provisions and by moving some factors in the multi-level formula.
The amending language of La. R.S. 11:103(B)(1) includes the participants in the Deferred Retirement Option Plan as part of the projected payroll of all active members. This factor is used to divide the actuarially required employer contribution determined under (B)(3) to determine the employer contribution rate. The amendment also removed the instruction to *829 round the resulting rate to the nearest one-quarter of one percent. This instruction was moved to the determination of the net actuarially required employer contribution in Paragraph (C).
The amending language of La. R.S. 11:103(B)(3)(a) removed the consideration of dedicated funds from the calculation of the employer's normal cost, a factor in determining the actuarially required employer contribution. The result of this determination is then plugged into the formula under La. R.S. 11:103(B)(1).
The amending language of La. R.S. 11:103(C)(1) accomplished two things: (1) rounded to the nearest one-quarter percent after calculation of the formula for the determination of the net direct actuarially required employer contribution, and (2) amended the cost element to be that of the gross required employer contribution as now provided in (B)(1). This cost element, minus the consideration of dedicated funds, is considered in La. R.S. 11:103(B)(3)(a) in the determination of the actuarially required employer contribution.

D. Acts 1997, No. 1293
Pursuant to Acts 1997, No. 1293, effective July 15, 1997, the legislature amended La. R.S. 11:103(C)(2)(b) to change the word "fixed" in the "Fixed portion" of the net direct employer's contribution to "Targeted portion." The legislature also enacted La. R.S. 11:103(C)(2)(b)(iv) to provide that each rate set forth as the targeted portion of the net direct employer's contribution, including the rate of 9% for the FRS,[58]is to be treated as a fixed rate unless a higher or lower rate results from application of the provisions of this Section in its entirety.[59]

4. Changes to IPTF Dedication

A. Acts 1991, No. 397
In addition to enacting La. R.S. 11:103(C), Acts 1991, No. 397 also amended La. R.S. 22:1419(A), which provided dedicated taxes in the IPTF as a funding source of the FRS and of two other statewide retirement systems. Prior to the amendment, the FRS received a dedicated two-tenths of one percent of the IPTF. The amendment provided that the FRS, the Municipal Police Employees' Retirement System and the Sheriffs' Pension and Relief Fund, which had formerly received dedicated tax assessments of two-tenths of one percent, four-tenths of one percent,[60] and one-tenth of one percent,[61] respectively, would now share a combined seven-tenths *830 of one percent of the IPTF.[62]
The 1991 amendment further directed how the retirement systems were to apply the IPTF funds. First, IPTF funds were to be used to meet the actuarially required contributions, i.e. the "gross employer contributions," after consideration of the statutory rates of employee contributions and the employer contributions as established in newly enacted La. R.S. 11:103(C). Second, IPTF funds were to be used for the funding of mergers of local retirement systems or funds, the aggregate of all mergers being funded in any one year not to exceed 25% of the total assessment in any one year. Any remaining funds were to be remitted to the state general fund.

B. Acts 2001, No. 1160, ง 2
Pursuant to Acts 2001, No. 1160, ง 2, the legislature amended La. R.S. 22:1419(A)(3) and (4), effective July 1, 2001, which affected the way in which the seven-tenths of one percent of the IPTF fund dedicated to the use of the FRS, the Municipal Police Employees' Retirement System and the Sheriffs' Pension and Relief Fund were to be distributed.[63]
*831 Under this amendment, the seven-tenths of one percent of the IPTF funds dedicated to the use of the FRS, Municipal Police Employees' Retirement System and *832 the Sheriffs' Pension and Relief Fund are to be divided into quarters. The first 25% is set aside to fund mergers over thirty years. Should the PRSAC deem a shorter period appropriate, the cost of such mergers cannot exceed 5% of the total assessment for that year and the aggregate of all mergers cannot exceed 25% of the total assessments in any single year. Of this initial 25%, the first $1.5 million is dedicated to the State Police Pension and Retirement System and must be paid before any of the mergers.
Each of the remaining quarters are dedicated to either the FRS, the Municipal Police Employees' Retirement System or the Sheriffs' Pension and Relief Fund to use to meet the remaining portion of the actuarially required employer contribution as determined by PRSAC. The legislature further instructed that, should any of these three retirement systems not use the entire 25% dedicated to them, then the unused allocated portion of the system that did not use its total annual allocated portion will be divided equally between the two remaining systems if they need additional funds to meet their actuarially required contribution. Funds that are reallocated to other systems are limited to only the amount which is necessary to meet the remaining portion of the actuarially required contributions. After payment of the amounts established by the PRSAC to the retirement systems as required by the legislature, any remaining funds shall be remitted to the state general fund.

FACTS AND PROCEDURAL BACKGROUND
Prior to 2002, the employers of members of the FRS paid the rate of 9% as their contribution to the FRS. The facts which led to the plaintiffs filing suit in this case are aptly summarized by the district court:
In February of 2002, Gary S. Curran, the Firefighters' Retirement System's ("FRS") actuary, informed the Board of Trustees of the FRS, by letter, that he would recommend that the Employer Contribution for Fiscal Year 2002-2003 be set at 18.25 percent.[[64]] On May 15, 2002, Mr. Curran informed the FRS Board of Trustees that he estimated the Employer's Contribution for Fiscal Year 2004 would be between 22.3 percent and 24.3 percent of payroll.[[65]] On January 29, 2003, Mr. Curran provided a revised projection for the Employer Contribution for Fiscal Year 2004 of 25 percent to 25.25 percent of payroll. [[66]]
Consequently, on February 13, 2003, plaintiffs filed suit, seeking "the issuance of a preliminary injunction during the pendency of the lawsuit and thereafter a permanent injunction in the same form and substance restraining, prohibiting, and enjoining the state of Louisiana and/or the FRS from requesting, demanding, or taking any other action in an attempt to collect payment from any of the Petitioners of funds allegedly owed by the Petitioners in excess of an amount equal to nine percent of the earnable compensation excluding overtime but including state supplemental pay for each firefighter eligible for membership in the FRS who is employed by plaintiff political subdivisions." See Petition, ถ 113. Further, the plaintiffs sought a declaratory judgment declaring that the plaintiffs are not liable for the payment of contributions in excess of an amount equal to nine percent based on a statutory construction argument and, in the alternative, that several legislative *833 acts and/or statutes, which would require employer contributions in excess of nine percent, are unconstitutional.[67]
As previously stated,[68] other governmental bodies who were employers of members of the FRS intervened as plaintiffs in the suit. An amended and restated petition was filed, presenting several arguments to support the plaintiffs' request for declaratory and injunctive relief.
Specifically, the plaintiffs sought declaratory relief both on statutory and, in the alternative, on constitutional grounds. Initially, the plaintiffs presented a statutory argument, asserting that the provisions of La. R.S. 11:2262(D)(1), which they claim sets a fixed employer contribution rate of 9%, is controlling and that the rate set forth therein cannot exceed 9%. The plaintiffs claimed that the provisions of La. R.S. 11:103 fail to state specifically that the employers of FRS members must pay any contribution other than the contribution rate of 9% set in La. R.S. 11:2262(D)(1).[69] Therefore, the plaintiffs contended that the provisions of La. R.S. 11:103 were not applicable to the FRS. Pursuant to La. R.S. 11:3, because there was no conflict between La. R.S. 11:2262(D)(1) and La. R.S. 11:103, La. R.S. 11:2262(D)(1) was the controlling statute for determining the employers' contribution rate to the FRS.
In the event that a statutory basis was found requiring more than a 9% employer contribution rate, the plaintiffs presented an alternative argument raising constitutional challenges to several statutes and legislative acts. The first constitutional challenge was that the legislature's delegation of authority to the PRSAC as found in La. R.S. 11:103 and 11:104 constituted an improper delegation of legislative authority in violation of La. Const. art. 3, ง 1. The plaintiffs claimed there are not adequate procedural safeguards to protect against an abuse of discretion.[70]
The second constitutional challenge was that Act 645 of 1991, which repealed the state guarantee of benefits in favor of members of the FRS, was a direct violation of La. Const. art. 10, ง 29(E)(5). The plaintiffs contended that the act impaired the accrued benefits of members of the FRS.[71]
The third constitutional challenge was that the legislature's passage of Act 397 of 1991, which repealed the FRS's allocation of two-tenths of one percent of funds in the IPTF, was unconstitutional as a direct violation of La. Const. art. 10, ง 29(E)(5). Plaintiffs claimed this amendment impaired the benefits of members of the FRS. In this same vein, the plaintiffs also contended that ง 2 of Act 1160 of 2001, which allocates the first $1.5 million of the first 25% of the IPTF funds, and then divides the remaining portion between the FRS and two other statewide public retirement systems, was unconstitutional in direct violation of La. Const. art. 10, ง 29(E)(5).[72] The fourth constitutional challenge was that the formula established in La. R.S. 11:103, as amended by Acts 792 and 1293 of 1997, which determines the net direct actuarially required employer's contribution as a floating rate above the fixed 9% level, was unconstitutional as a direct *834 violation of La. Const. art. 10, ง 29(E)(3) and (4).[73]
The fifth constitutional challenge was that, to the extent Acts 1293 and 792 of 1997 require an employer contribution rate above the fixed 9%, the Acts were unconstitutional for the reasons previously stated. As a consequence, the plaintiffs claimed that the requested employer contribution in excess of the 9% fixed rate did not constitute amounts demanded by the state and/or the FRS as a result of a law providing for benefits for employees in pension or retirement systems; thus, the requests constituted a violation of La. Const. art. 6, ง 14(A) and La. Const. art. 7, ง 14(A).[74]
The plaintiffs' request for injunctive relief was based on the allegations of unconstitutionality of the statutes and legislative acts placed at issue.[75] In other words, the plaintiffs claimed they were entitled to injunctive relief because the state and the FRS were relying upon unconstitutional statutes and legislative acts in attempting to collect an employers' contribution rate to the FRS in excess of 9%. To the extent that a showing of irreparable harm was necessary, plaintiffs alleged that irreparable harm would be sustained by them in that the payment of employer contributions in excess of the rate of 9% would impair the delivery of essential services by local political subdivisions and would, in certain instances, have an adverse impact on certain categories of citizens through increased property insurance premiums.[76]
The state and the FRS filed an exception of non-joinder of parties, claiming that, since plaintiffs sought to have Acts 2001, No. 1160 ง 2 declared unconstitutional, then both the State Police Pension and Retirement System, which obtained funding pursuant to that amendment, and the Sheriffs' Pension and Relief Fund, which was affected by the amendment in the same way as the FRS, should be joined as necessary parties under La.Code Civ. Proc. arts. 641 and 642.[77] In connection with the exception of non-joinder of party, the defendants intended to call Mr. Curran, the FRS actuary, to testify as to the financial impact these other retirement systems would sustain if the acts were declared unconstitutional. The plaintiffs filed a motion in limine, seeking to exclude Mr. Curran's testimony at the hearing, and at trial insofar as he would testify as to his inferences about and application of FRS laws and his opinions on actuarial funding.[78] After a hearing, the district court overruled the defendant's exception of nonjoinder of parties and granted the plaintiffs' motion in limine, excluding Mr. Curran's hearing testimony in support of the exception of non-joinder of parties and excluding testimony at trial as to Mr. Curran's inferences regarding the FRS laws and actuarial funding.[79]
The state answered the plaintiffs' Amended and Restated Petition, generally denying its allegations.[80] In its answer to *835 the plaintiffs' petition, the FRS filed an answer, a cross-claim against its co-defendant, the state, and a reconventional demand against certain municipalities.[81] Prior to trial, the FRS filed a motion to sever its cross-claim, which was not opposed, and was granted by the district court.[82]
Pursuant to a status conference held on July 25, 2003, an Order, signed July 28, 2003, ordered that the FRS take no action to demand or collect employer contribution rates in excess of 9% and that trial on the merits would be continued to a new date.[83] Ultimately, the trial on the merits went forward on November 12 through 13, 2003, and the matter was taken under advisement by the district judge.
The district judge issued written reasons and a judgment on November 20, 2003, making the following findings: (1) La. R.S. 11:2262(D) and 11:103 must be read together as setting a 9% target rate of employer contributions that may fluctuate higher or lower; (2) the legislature may delegate their power to set the employer contribution rate for statewide retirement systems; however, the legislature did not do so properly with regard to the FRS because it did not provide the required checks and balances; (3) Act 645 of 1991, Act 397 of 1991 and ง 2 of Act 1160 of 2001 violate Article 10, ง 29(E)(5) of the Louisiana Constitution of 1974; (4) Acts 792 and 1293 of 1997 violate Article 10, Section 29(E)(3) and (4) of the Louisiana Constitution of 1974; thus, La. R.S. 11:103 and 104 are unconstitutional as applied to the FRS; and (5) Acts 792 and 1293 of 1997 do not violate Article 6, ง 14(A) or Article 7, ง 14(A) of the Louisiana Constitution of 1974.[84] Based upon these findings, the district court ordered that the FRS be permanently enjoined from collecting an employer contribution at a rate in excess of 9% from any employer whose employees are members of the FRS.[85]
The defendants suspensively appealed to this court pursuant to La. R.S. 13:4431.[86] In its appeal, the state challenges the district court's denial of the exception of non-joinder, asserting the district court erred in failing to join the State Police Pension and Retirement System and the Sheriffs' Pension and Relief Fund as parties. In addition, the state challenges the district court's granting of the plaintiffs' motion in limine excluding the testimony of Mr. Curran from the joinder hearing. Both the state and the FRS challenge the district court's declarations of unconstitutionality *836 of the statutes and legislative acts at issue.[87]

LAW AND ANALYSIS
The plaintiffs' primary argument is one of statutory construction. The plaintiffs claim that the provisions of La. R.S. 11:2262(D)(1) set a flat, fixed employer contribution rate of 9% which cannot be increased or decreased. They assert that there is nothing in the language of La. R.S. 11:103 which mandates payment of any rate of employer contribution over 9%. Therefore, the plaintiffs argue there is no conflict between the two statutes and, under La. R.S. 11:3,[88] the specific language of La. R.S. 11:2262(D)(1) is controlling.
Although the plaintiffs alternatively present arguments regarding the unconstitutionality of the statutory scheme of FRS funding, it is proper for this court to first determine whether the issues may be disposed of on non-constitutional grounds. Ring v. State, DOTD, XXXX-XXXX p. 4 (La.1/14/03), 835 So.2d 423, 426 ("Courts should avoid constitutional rulings when the case can be disposed of on non-constitutional grounds."). Constitutional issues should be determined only when necessary to resolve a conflict. Id. ("... [C]ourts should refrain from reaching or determining the constitutionality of legislation unless, in the context of a particular case, the resolution of the constitutional issue is essential to the decision of the case or controversy."); Louisiana Associated General Contractors, Inc. v. New Orleans Aviation Board, 97-0752 p. 4 (La.10/31/97), 701 So.2d 130, 132 ("A court should not reach or determine constitutional issues unless, in the context of a particular case, the resolution of such issues is necessary to decide the case."). Thus, the court will first address the plaintiffs' primary argument which requires an analysis of the two statutes at issue.

Statutory Analysis
Questions of law, such as the proper interpretation of a statute, are reviewed by this court under the de novo standard of review. Cleco Evangeline v. Louisiana Tax Com'n, 2001-2162 p. 3 (La.4/3/02), 813 So.2d 351, 353. After our review, we "render judgment on the record, without deference to the legal conclusions of the tribunals below. This court is the ultimate arbiter of the meaning of the laws of this state." Id.[89]
"Legislation is the solemn expression of legislative will, and therefore, the interpretation of a law involves primarily the search for the legislature's intent." La.Code Civ. art. 2; Detillier v. Kenner Regional Medical Center, XXXX-XXXX p. 3 (La.7/6/04), 877 So.2d 100, 103; Grant v. Grace, 2003-2021 p. 4 (La.4/14/04), 870 So.2d 1011, 1014; Sultana Corp. v. Jewelers Mut. Ins. Co., XXXX-XXXX p. 3 (La.12/3/03), 860 So.2d 1112, 1115. The interpretation of a statute starts with the *837 language of the statute itself. Grant, 2003-2021 p. 4, 870 So.2d at 1014. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature. La.Code Civ. art. 9; Detillier, XXXX-XXXX p. 4, 877 So.2d at 103.
The laws of statutory construction require that laws on the same subject matter must be interpreted in reference to each other. La.Code Civ. art. 13; Detillier, XXXX-XXXX p. 4, 877 So.2d at 103. The legislature is presumed to have acted with deliberation and to have enacted a statute in light of the preceding statutes involving the same subject matter. Detillier, XXXX-XXXX p. 8, 877 So.2d at 106; Grant, 2003-2021 p. 5, 870 So.2d at 1014, citing Theriot v. Midland Risk Ins. Co., 95-2895 (La.5/20/97), 694 So.2d 184, 186. "Under our long-standing rules of statutory construction, where it is possible, courts have a duty in the interpretation of a statute to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter." Hollingsworth v. City of Minden, 2001-2658 p. 4, 828 So.2d 514, 517; Grant, 2003-2021 p. 5, 870 So.2d at 1014, citing Theriot, 95-2895, 694 So.2d at 186.
A statute must be "applied and interpreted in a manner that is logical and consistent with the presumed fair purpose and intention the Legislature had in enacting it." Sultana Corp., XXXX-XXXX p. 4, 860 So.2d at 1116. In addition, "courts are bound to give effect to all parts of a statute and cannot give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided." Hollingsworth, 2001-2658 p. 5, 828 So.2d at 517; Sultana Corp., 2003, 0360 p. 4, 860 So.2d at 1116.
Giving effect to all of the parts of La. R.S. 11:103 and La. R.S. 11:2262(D)(1), as we are bound to do, and interpreting each statute in reference to the other, we find that the two statutes not only can be read together, but must be read together in order to determine the actuarially required employer contribution rate for the FRS. Since its original enactment, the formula for determining the employer contribution rate found in La. R.S. 11:103 has been applicable to all public retirement systems whose benefits are not guaranteed by the state. We know this from the clear wording of the statute: "The provisions of this statute are applicable with respect to those state and statewide public retirement systems whose benefits are not guaranteed ...";[90] "for each public retirement system referenced in Subsection A of this Section, the employer contribution rate shall equal...";[91] and "the actuarially required employer contribution... shall be...."[92] In 1991, the legislature repealed the state guarantee of FRS benefits. Thereafter, the provisions of La. R.S. 11:103 applied to determine employer contributions to the FRS.
When understood in context, former La. R.S. 33:2160(D)(1), now La. R.S. 11:2262(D)(1), provides one of the factors of the formula described in La. R.S. 11:103, i.e. the rate of 9% as the fixed portion of the employer's contribution. The flaw in the plaintiffs' argument is that they maintain both that the fixed 9% rate in La. R.S. 11:2262(D)(1) is a flat, fixed rate that cannot be decreased nor increased and that La. R.S. 11:2262(D)(1) describes the only contribution to the FRS *838 for which the employers are directly responsible. This has never been the case.
The fact that the 9% rate fluctuates was included in the annual FRS valuation reports from 1989 until 2002.[93] Indeed, even the 1997 Actuarial Report by the Legislative Auditor on Louisiana public retirement, issued May 1998, specifically provides in the Executive Summary on "Overall Funding for Pension Benefits," that "[e]mployer contribution rates are actuarially determined each year through an actuarial valuation. For FRS, MPERS and SPRF, a portion of the employer contribution rate is set by statute."[94] That a portion of the direct employer contribution rate is fixed has been a part of the overall funding mechanism of the FRS since its inception.
Former La. R.S. 33:2160(D)(1) provided that the employers "shall contribute an amount equal to nine percent of the earnable compensation excluding overtime but including state supplemental pay ...". Additionally, former La. R.S. 33:2160(D)(3) also envisioned a fluctuating "normal contribution rate" payable by the employers based on periodic and current actuarial valuations that included factors such as regular interest and mortality tables. Moreover, the gross employers' contribution, which would be accumulated in the Pension accumulation sub-fund of the FRS, included not only the fixed amount and any additional amount needed paid directly by the employer, but also the dedicated IPTF funds, "as necessary to fund the system on the basis of its accrued liabilities, as shown by actuarial valuation."[95]
As explained by the FRS actuary, Mr. Curran, the components of the total [or gross] employer contribution rate for the FRS are as follows:[96]
The employer contribution rate for Firefighters' Retirement System consists, really, of three parts. It's a baseline rate of nine percent paid by the employers, an additional portion allocated from the insurance premium taxes, and then any additional required component above that nine percent for the employers.[97]
The interrelation of the three factors of gross employer contributions, along with the other factors considered in the multi-level formula, achieve actuarial soundness of the FRS by balancing the equation. If *839 the actuarially determined liabilities increase, they must be balanced by assets of the retirement system. The assets of the FRS include employee contributions, interest from investments, direct employer contributions and dedicated tax revenue from the IPTF. Since the employee rate of contribution is set by statute, and interest on investments will be determined by prevailing market conditions, the only other method of increasing assets is by increasing the actuarially required employer contribution rate, which consists of direct employer contributions and IPTF funds. If IPTF funds are limited or exhausted, then the only source of funding which is able to "move" or "float" under that scenario is the direct employer contribution rate, which will rise above the fixed portion of the direct employer contribution set forth in former La. R.S. 33:2160(D)(1) (now La. R.S. 11:2262(D)(1)).[98]
A reading of La. R.S. 11:103 together with former La. R.S. 33:2160 in their entirety and within the proper historical context plainly demonstrates that, from the inception of the FRS, the legislature understood the rate of direct employer contributions, as a portion of the gross employer contribution, could fluctuate from year to year based on periodic actuarial valuations. After the enactment of Acts 1988, No. 81 in the midst of the state's fiscal crisis, La. R.S. 11:103 and former La. R.S. 33:2160(D) could clearly be read together, with La. R.S. 11:103 supplying the formula by which the actuarially required employer contribution was determined and former La. R.S. 33:2160(D) supplying one of the factors to fit into the formula. The only fixed mandate was that the employers directly contribute a baseline rate of 9% monthly to the FRS.[99]
The re-designation of former La. R.S. 33:2151 through La. R.S. 33:2165 into Title 11 did not effect a change in the law.[100] In addition, the current versions of La. R.S. 11:103 and La. R.S. 11:2262 that are applicable to the instant case do not indicate any intent on the part of the legislature to change this scheme.
La. R.S. 11:103 continues to provide the formula used to determine the employer contributions to public retirement systems whose benefits are not guaranteed by the state.[101] La. R.S. 11:2262(D)(1) still provides *840 *841 one of the factors which is plugged into the formula in order to make the actuarial calculation. Subsequent amendments to La. R.S. 11:103 have clarified that this is so. The enactment of and subsequent amendments to Paragraph(C) of La. R.S. 11:103 make explicit the fact that the fixed portion of the employers' contribution rate, the 9% described in La. R.S. 11:2262(D)(1), is an element of the gross employer contribution, a factor in the formula to determine the actuarially required employer contribution.[102]
It is clear that the legislature must provide some fixed factors in the equation in order for the actuarial analysis to be performed. The formula described in La. R.S. 11:103 is structured in such a way that the fixed and known factors can be plugged in to determine the unknown factors for determining actuarial soundness, such as whether an additional amount *842 above the fixed portion of the direct employer contribution rate of 9% is required in order to maintain the FRS on an actuarially sound basis. As explained by the FRS actuary, some parts of the formula must be known in order for the actuarial calculation to be made:
FRS Counsel:
Can you please tell the court why you begin with the nine percent component when you formulate your rate?
Mr. Curran:
The insurance premium tax component has the potential to vary, depending upon the circumstances in funding of the retirement system. And in order to determine the amount necessary from insurance premium taxes, the formula in the law is structured in such a way as to provide a nine percent baseline for that calculation purpose.
FRS Counsel:
So in your individual expert formulation of the rate, do you find that you are able to set the employer rate without first knowing that first component?
Mr. Curran:
No, you have to have sort of a constant, if you will. If the funding is above that nine percent level, then you'd have to hold that constant in order to determine the variable portion of the insurance premium taxes.[103]
When all of the parts of the two statutes are understood, and the two statutes are read together, it is clear that La. R.S. 11:103 and La. R.S. 11:2262(D)(1) are not in conflict, but work together seamlessly to create an actuarially sound retirement system. Insofar as the district court concluded that these two statutes are not in conflict and must be read together, that finding is affirmed.[104]
Insofar as plaintiffs argue that the formula described in La. R.S. 11:103 is not applicable to the FRS, the plaintiffs' statutory argument has no merit. Therefore, we must now address the plaintiffs' constitutional challenges to the statutes comprising the funding structure of the FRS.

Constitutional Analysis
The question whether the statutes at issue are constitutional is a legal question which will be reviewed de novo. Cleco Evangeline, 2001-2162 p. 3, 813 So.2d at 353.[105] This court has repeatedly held that statutes are generally presumed to be constitutional and the party challenging the validity of the statute has the burden of proving it is unconstitutional. State v. Fleury, XXXX-XXXX p. 5 (La.10/16/01), 799 So.2d 468, 472; Board of Com'rs of North Lafourche Conservation, Levee and Drainage Dist. v. Board of Com'rs of Atchafalaya Basin Levee Dist., 95-1353 p. 3 (La.1/16/96), 666 So.2d 636, 639. Unlike the federal constitution, the Louisiana "constitution's provisions are not *843 grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its legislature." Board of Com'rs, 95-1353 p. 3, 666 So.2d at 639. Therefore, "the legislature may enact any legislation that the state constitution does not prohibit." Id. Because this is so, "[t]he party challenging the constitutionality of a statute must also cite to the specific provision of the constitution which prohibits the legislative action." Fleury, XXXX-XXXX p. 5, 799 So.2d at 472; Board of Com'rs, 95-1353 p. 4, 666 So.2d at 639.
The plaintiffs bear the burden of proving the unconstitutionality of the statutes at issue. Thus, the plaintiffs' constitutional challenges advanced in the trial court and in brief to this court will be reviewed. Womack v. Louisiana Commission on Governmental Ethics, 250 La. 833, 841, 199 So.2d 891, 894 (La.1967) (when a trial judge declares a statute or act unconstitutional, we do not limit our review to the reasons set forth by the trial court, but "shall discuss all constitutional contentions advanced by plaintiff in the trial court and argued herein in brief.").

Delegation of Authority
The plaintiffs' first constitutional challenge was that the legislature's delegation of authority to the PRSAC as found in La. R.S. 11:103 and La. R.S. 11:104 constituted an improper delegation of legislative authority to an executive branch commission in violation of La. Const. art. 3, ง 1 and La. Const. art. 10, ง 29(E)(3). La. Const. art. 10, ง 29(E)(3) provides in pertinent part that "the legislature shall determine all required contributions ... to be made by employers...."
La. Const. art. 3, ง 1 provides that the legislative power of the state is vested in the legislature. The legislative power includes "absolute control over the finances of the state, except as limited by constitutional provisions." Louisiana Pub. Facilities Auth. v. Foster, XXXX-XXXX p. 18 (La.9/18/01), 795 So.2d 288, 301. Moreover, "it is the legislature that decides how the branches and departments of government shall be funded from the public fisc." Id. The plaintiffs maintain that PRSAC improperly wields legislative power in setting the employer contribution rate for the FRS pursuant to La. R.S. 11:103 and La. R.S. 11:104. Plaintiffs also complain there are no checks and balances to PRSAC's power in setting the employer contribution rate for statewide public retirement systems whose benefits are not guaranteed by the state, including the FRS.
"Primary legislative power, strictly speaking, may not be delegated, but administrative and ministerial functions may, by statute, be delegated to an agency in the executive branch." State v. Alfonso, XXXX-XXXX p. 6 (La.11/23/99), 753 So.2d 156, 160. Considering the vast spectrum of governmental functions vested in the legislature, the delegation of certain administrative functions may be appropriate, especially where the legislative body may wish to utilize the particular skills and experience of various agencies or commissions. Id., XXXX-XXXX p. 6-7, 753 So.2d at 160-161. With regard to the legislative delegation of authority to an executive branch agency or commission, this court has previously stated:
Recognizing that the Louisiana Constitution unequivocally mandates the separation of powers among the three branches of state government, this court in delegation cases traditionally has distinguished between delegations of purely legislative authority, which necessarily violate the separation of powers, and delegations of ministerial or administrative *844 authority, which do not. The court explained the distinction in Schwegmann Brothers Giant Super Markets v. McCrory, 237 La. 768, 787-88, 112 So.2d 606, 613 (1959) (footnotes omitted) (emphasis added):
Due to the complexity of our social and industrial activities, the decisions display an increasing tendency to hold as non-legislative the authority conferred upon commissions and boards to determine the facts or state of things upon which the law intends to make its action depend. It is now well settled that the Legislature may make the operation or application of a statute contingent upon the existence of certain conditions, and may delegate to some executive or administrative board the power to determine the existence of such facts and to carry out the terms of the statute. So long as the regulation or action of the official or board authorized by statute does not in effect determine what the law shall be, or involve the exercise of primary and independent discretion, but only determines within prescribed limits some fact upon which the law by its own terms operates, such regulation is administrative and not legislative in its nature.
* * *
Consistent with the distinction drawn in Schwegmann between delegations of legislative authority versus delegations of administrative or ministerial authority, the court on numerous occasions has recognized that where an enabling statute expresses a clear legislative policy and contains sufficient standards for the guidance of the administrative official empowered to execute the legislative will, the legislature may delegate to an administrative agency and determine the facts upon which the law is to be applied and enforced.
State v. All Pro Paint & Body Shop, Inc., 93-1316 p. 5-6 (La.75/94), 639 So.2d 707, 711-712 (emphasis in originals).
This court has adopted a three-prong test for determining, on a case-by-case basis, whether a particular delegation of power is constitutional. A delegation of authority to an administrative agency, or commission, is constitutionally valid if the enabling statute: (1) contains a clear expression of legislative policy; (2) prescribes sufficient standards to guide the agency in the execution of that policy and (3) is accompanied by adequate procedural safeguards to protect against abuse of discretion by the agency. Alfonso, XXXX-XXXX p. 8, 753 So.2d at 161; All Pro, 93-1316 p. 7, 639 So.2d at 712.
Application of the three-prong Schwegmann test to determine the constitutionality of La. R.S. 11:103 and La. R.S. 11:104 convinces us that the statutes delegate only ministerial or administrative authority to the PRSAC, and not legislative authority, and that sufficient standards and procedural safeguards are present to protect against an abuse of discretion.
The Schwegmann test first requires us to determine whether the enabling statute contains a clear expression of legislative policy. To make this determination, we must look to the legislatively-stated purpose of both the statutes at issue and the statutes relating to the formation of the PRSAC. Title 11 ["Consolidated Public Retirement Systems"], Chapter 2 ["Required Contributions"], Part 2 ["Contribution Provisions"], Subpart E ["Employer Contributions"], contains the legislative statement of purpose applicable to both La. R.S. 11:103 and La. R.S. 11:104 in La. R.S. 11:101, which provides:
The purpose of this Subpart is to provide mechanisms to implement compliance with the requirements of Article X, *845 Section 29(E)(2)(b) and (c) and (3) of the Constitution of Louisiana that the legislature provide with respect to employer funding of state and statewide public retirement systems.
The purpose of the statutes at issue is clear. The legislature is providing the formula by which the employee contributions, employer contributions, dedicated tax contributions and amortized unfunded accrued liabilities will be considered in order to achieve actuarial soundness of the state and statewide public retirement systems, as required by the constitution.
Title 11 ["Consolidated Public Retirement Systems"], Chapter 3 ["Public Retirement Systems' Actuarial Committee"] contains the legislative statement of purpose applicable to the PRSAC in La. R.S. 11:121(B), which provides:
B. The legislature recognizes that the fiscal integrity of the state and statewide retirement systems and pension plans or funds is a priority and is necessitated by the current financial condition of the systems, plans, or funds. This actuarial committee is created with the intent that a plan can be developed to insure orderly and consistent strategies for continuing development and growth that will attain and maintain the soundness of the systems, plans, or funds. The purpose of this Chapter is to provide an entity to advise and coordinate this ongoing process and to advise the Joint Legislative Retirement Committee of all findings and recommendations.
Thus, the purpose of the PRSAC is to advise and coordinate the legislative process which is charged with attaining and maintaining the soundness of the state and statewide retirement systems, plans or funds.
The clear expression of legislative policy shows that there is no unconstitutional delegation of legislative authority to the PRSAC. Instead, the PRSAC's sole purpose is to "coordinate" the legislative process; in other words, to administer or perform the ministerial tasks assigned by the legislature in its on-going process of providing mechanisms by which actuarial soundness may be achieved and maintained by the state and statewide public retirement systems.
The second and third prongs of the Schwegmann test require us to determine whether the legislature prescribes sufficient standards to guide the PRSAC in the execution of its administrative or ministerial function and whether there are adequate procedural safeguards to protect against an abuse of discretion by PRSAC. We find that the legislature has provided a precise blueprint of action for the PRSAC in La. R.S. 11:103 and La. R.S. 11:104.
As previously described, La. R.S. 11:103 provides a multi-level formula for determination of the employer contribution rate for statewide public retirement systems. In very simplified form, the legislature supplies known components of that formula with regard to the FRS by statute. After calculation of the multi-level formula, the unknown components are determined, including the direct employer contribution.
In La. R.S. 11:104, the legislature has authorized the PRSAC to perform the actual calculation of the formula, intrinsically a ministerial duty, and to inform the employers or retirement systems what the employers' contribution rate will be each year. In effect, the legislature has asked actuaries to perform actuarial duties. In performing actuarial duties, actuaries must make assumptions because they are projecting their analysis into the future. The legislature understood that this is part of an actuary performing his or her duty and that this type of calculation was necessary for determining actuarial soundness into *846 the future. The fact that the PRSAC must make actuarial assumptions in order to make actuarial valuations does not mean that the PRSAC has unbridled discretion in performing its function. The legislature provided guidelines in La. R.S. 11:103 for the assumptions that the actuaries are required to make in performing the calculations of the formula.
Each step of the multi-level formula is guided by legislative instruction. La. R.S. 11:103(A) states to which public retirement systems the formula applies. La. R.S. 11:103(B)(1) provides the general formula and mandates that "the employer contribution rate shall equal...." La. R.S. 11:103(B)(2) provides the method for determining the fiscal year's short fall amount, yet another factor in the equation.
La. R.S. 11:103(B)(3) provides the formula for determining the actuarially required employer contribution as the sum of several factors. At each step, the legislature directs how those factors are to be determined, including the funding method as specified by the legislature in La. R.S. 11:22, the amortization method specified in La. R.S. 11:42, and the period of time over which the amortized payments are to be computed.[106]
La. R.S.11:103(C) provides the formula for determining the net direct actuarially required employer contribution for each fiscal year. The legislature directs a precise formula, describing the factors to be used in the calculation. The legislature even clarified that the "targeted portion" of the net direct employer's contribution โ 9% for the FRS, 9% for the Municipal *847 Police Employees' Retirement System, and 7% for the Sheriffs' Pension and Relief Fund โ is "to be treated as a fixed rate unless a higher or lower rate results from application of the provisions of this Section in its entirety."[107]
La. R.S. 11:103(D) was enacted by Acts 2003, No. 620, ง 1 and became effective June 27, 2003. Although this amendment to the statute was not in effect at the time this suit was filed, the amendment shows the continuing input of the legislature into all of the details of the multi-level formula. In Paragraph (D), the legislature responded to a funding issue which impacted FRS actuarial soundness by changing the method of amortizing FRS debt.[108]
Each stage of the calculation described in La. R.S. 11:103 is directly controlled by legislative instruction. At trial, the FRS actuary, Mr. Curran, seemed honestly puzzled when questioned about PRSAC's "interpretation" of the formulas in La. R.S. 11:102 and 103. To an actuary, the formulas provided by the legislature are clear and explicit:
Q: ... Now, has the PRSAC adopted a position in the interpretation of Louisiana Revised Statute 11:102 and 11:103? And if so, please state what the position is.
A: I think you'd have to be more specific. With regard to what? I mean, you know we operate on a whole ...
Q: In regard to the interpretation of the two provisions?
A: A position on the interpretation of those provisions?
Q: Yes, sir.
A: I don't understand with regard to what issues though.
Q: To the interpretation of the provisions. What do they mean? Has the PRSAC adopted such a position?
A: I think operationally, we've dealt with our understanding of what those two sections mean, yes. I mean, they โ those sections, in effect, give a very long lengthy description, 102 and 103, which describes the methodology that is utilized to arrive at the employer contribution rate, and that methodology has got a lot of steps involved into it. And it stipulates to the actuarial funding method for each plan, and the amortization periods and methods for funding the unfunded liability. I don't know if there's a position with regard to it, just read on the face of it is pretty explicit. I really don't understand, beyond that, what you're asking for.
Q: I'm asking, has the committee formally adopted a position on the interpretation of that provision?
A: Well, I'm sorry, I just โ
Q: If you don't know โ
A: I don't understand. A position on that, you're talking about maybe forty or fifty elements, you know. Are you talking about a particular element?
Q: I'm talking about the whole section.
A: Well, we have โ we are interpreting โ we're forced to interpret, in order to execute the assignment we've been handed, to interpret all the elements of 102 and 103.

*848 Q: Have there been any disagreements among members of the PRSAC about the interpretation of 103?
A: 103? Not that I can recall in terms of โ in terms of 103 and interpreting it, possibly, but I don't recall right now if there were.
Q: That's fair enough.[109]
Although an actuary exercises independent judgment and discretion in a broad sense in performing the calculation,[110] the actuarial assumptions applied in performing the calculation set forth by the legislature must be done so within the guidelines which are supplied by the legislature. As described by Mr. Curran:
Q: How is it that you go about applying those assumptions?
A: They're really within the framework of the actuarial method that is adopted for the valuation, and that method is explicitly given for each system in the statute. In addition, certain of the assumptions or procedures are also explicitly given in the statutory language. The length of the period for amortization of each unfunded liabilities is listed in the statute. The method over which that amortization takes place is listed in the statute as well. So the basic starting point of all of that process is the statutory language which describes or gives a recipe, if you will, for arriving at the results.
Q: Okay. Mr. Curran, then โ in your practice and applying within that framework, do you, as a practice, deviate from the framework of the law?
A: No, we have to follow what the statute gives us.[111]
Because the legislature has prepared such a precise blueprint in providing the multi-level formula in La. R.S. 11:103, the only thing for the PRSAC to do is to perform the calculations as instructed. La. R.S. 11:104(A) merely instructs the PRSAC to determine the employer contribution rate "as referred to in this Subpart" by a certain date.
Within ten business days thereafter, the PRSAC chairman must notify each employer or retirement system that the referenced rate will be recommended to the legislature for approval, or that the given rate is the rate which must be used by the *849 employer or retirement system, "whichever is appropriate under the provisions contained in R.S. 11:102 and 103." La. R.S. 11:104(B). Whether the legislature must approve or adopt the recommendation of the PRSAC as to the employer contribution rate or whether the rate calculated by the PRSAC is the rate to be used depends on whether the formula used is for state guaranteed systems, La. R.S. 11:102, or whether the formula used is for systems not guaranteed by the state, La. R.S. 11:103.
Under La. R.S. 11:104(B), the employer contribution rate obtained by the PRSAC after performance of the calculation described in La. R.S. 11:103 is the employer contribution rate prescribed by the legislature. The legislature has provided explicit instructions for how the rate is to be determined. The PRSAC has only to apply the legislature's instructions to determine what the rate should be.
By contrast, the result of the calculation of the formula in La. R.S. 11:102, applicable to public retirement systems whose benefits are guaranteed by the state, must be presented to the legislature because, by statute, "the legislature shall set the required employer contribution rate." La. R.S. 11:102(B)(1). The legislature must set the rate for state guaranteed systems because the state must directly pay the annual shortfall between the actuarially required employer contribution rate and the employer contributions actually received and that amount is paid by the state treasurer from the state's general funds. Therefore, under La. R.S. 11:104(B), it is appropriate for the PRSAC to recommend to the legislature for approval the employer contribution rate for state guaranteed systems and it is appropriate for the PRSAC to notify each employer or retirement system what the rate shall be for systems not guaranteed by the state.
The plaintiffs' argument, that PRSAC improperly wields legislative power in setting the employer contribution rate for the FRS, fails because it is the legislature which provides the precise formula by which the employer contribution rate is set. The PRSAC is merely the commission directed by the legislature to perform the calculations of the formula. Each step of the calculation of the formula which the legislature directs the PRSAC to perform is determined and guided by the legislature. Therefore, any delegation of authority by the legislature is ministerial or administrative in nature, and is motivated by the legislature's need for the actuarial expertise of the PRSAC. We find the delegation of this ministerial or administrative duty with sufficient standards and adequate procedural safeguards is proper.
Based on the foregoing, the district court's analysis of this issue, and its conclusion that La. R.S. 11:103 and 104 are unconstitutional delegations of authority as they pertain to the FRS, are reversed.[112] We find that La. R.S. 11:103 and 104 are constitutional both facially and as applied to the FRS.[113]

Funding of FRS
The plaintiffs' second and third constitutional challenges concern amendments to the funding structure of the FRS which plaintiffs claim violate the constitutional mandate in La. Const. art. 10, ง 29(E)(5) that "[t]he accrued benefits of members of any state or statewide public retirement system shall not be diminished or impaired."
*850 Act 645 of 1991 repealed the state guarantee of benefits in favor of members of the FRS set forth in former La. R.S. 33:2165 and re-designated as La. R.S. 11:2269. Plaintiffs argue that the state guarantee of benefits was an accrued benefit of the statewide retirement system when Section 29(E) was adopted. Thus, they claim that repealing the state guarantee of benefits impairs the accrued benefits of the members, in violation of the state constitution, because the system can no longer require the state to pay the shortfall amounts calculated on an annual basis.
Act 397 of 1997 and ง 2 of Act 1160 of 2001 changed the amount of IPTF funds available and the priority of how those IPTF funds are paid out to the FRS and to two other public retirement systems. The plaintiffs argue that the former funding structure prior to amendment was an accrued benefit to the system and that the amendments to the funding structure impairs the accrued benefits of the members, in violation of the state constitution, in that there are less funds from which the annual shortfall amount may be paid.
The plaintiffs, and the district court in its judgment, have confused the accrued benefits of its members with the benefit to the employers which existed in the former funding structure of the FRS.[114] The funding of the system and the payment of benefits to the members of the system are not synonymous. A change in the funding structure does not mean a change in accrued benefits; the only thing changed is how the accrued benefits will be funded. The fact that a statewide public retirement system is not guaranteed by the state means that shortfalls in the annual calculation of actuarially required contributions are not paid directly each year by the state treasurer from the state general fund. The legislature still has the ultimate obligation under the constitution to ensure that the system is actuarially sound, and that accrued benefits are paid. The legislature can do so by devising another method of funding the system or by devising another method to deal with the shortfall amount between the actuarially required employer contribution and the employer contributions actually received, such as providing a formula where these shortfalls are amortized over time.[115]
Under the former funding structure, the plaintiffs benefitted when the system's shortfall amount was paid by the state general fund or when the contributions of employers at 9% and the funds in the IPTF were sufficient to balance the actuarial formula. The legislative acts at issue affected the funding structure, i.e. by whom the accrued benefits would be paid, and not the accrued benefits themselves.
As previously stated, the legislative power of the state is vested in the legislature. La. Const. art. 10, ง 3. "In its exercise of the entire legislative power of the state, the legislature may enact any legislation that the state constitution does not prohibit." Louisiana Pub. Facilities Autho., XXXX-XXXX p. 14, 795 So.2d at 298. The Louisiana Constitution mandates in Section 29(E) that the legislature must attain and maintain actuarial soundness of *851 the state and statewide public retirement systems. The Louisiana Constitution does not dictate how that actuarial soundness is to be accomplished, nor does it prescribe how the state and statewide public retirement systems are to be funded. The mechanism by which actuarial soundness is achieved is left to the discretion of the legislature.
Moreover, the funding system provided by the legislature for statewide public retirement systems whose benefits are not guaranteed by the state is working as it was designed to with regard to the FRS. The FRS is a defined benefit plan. A defined benefit plan is one where the employee, upon retirement, is entitled to a fixed payment, in this case as provided by statute. In this type of plan, typically, the employer bears the risk of any under-funding as a result of a shortfall which may occur from the system's investments.[116]
La. R.S. 11:103 is conducive to a defined benefit plan. The formula established therein provides for the employer to bear the risk of a shortfall that may occur from the system's investments. That risk is assumed by the ability to float the employer rate, which helps the system maintain actuarial soundness.[117] Ultimately, the accrued benefits of the system's members will not be diminished or impaired as long as the funding structure is actuarially sound. It is within the legislature's discretion to determine how that funding structure is to be configured and who is required to contribute into the system.[118]
If the plaintiffs' argument were true, there would be no public retirement systems whose benefits were not guaranteed by the state, the legislature would not have the authority to determine how public retirement systems should be funded from the public fisc nor would the legislature be able to change a funding structure once implemented. The converse of all of these situations is true. There are nine public retirement systems whose benefits are not guaranteed by the state. The legislature retains complete authority for determining how the branches and departments of government shall be funded from the public fisc. Louisiana Pub. Facilities Auth., XXXX-XXXX p. 18, 795 So.2d at 301. The legislature has the discretion to change the funding structure of a public retirement system, provided that the constitutional requirements are met. Indeed, the constitution contemplates the legislature's use of its authority to make changes even to the future benefit provisions of public retirement systems, as long as these *852 amendments are properly made through legislation.[119]
Based on the foregoing analysis, the district court's judgment, which found Acts 397 and 645 of 1991, and ง 2 of Act 1160 of 2001 to be in violation of La. Const. art. 10, ง 29(E)(5), is reversed.[120]

Amendments to Formula
In the plaintiffs' fourth constitutional challenge, they asserted that Acts 792 and 1293 of 1997, as they amended the formula in La. R.S. 11:103, violate La. Const. art. 10, ง 29(E)(3) and (4). The plaintiffs contend that the amendments turn the formula in La. R.S. 11:103 into a method by which the expected costs of expenditures will ultimately drive or fix the amount of the employer contribution and result in a formula in which there are no limits to the costs that are passed on to the employers. The plaintiffs urge that these acts violate the constitution because application of a formula which allows the employer contribution rate to float makes the value of assets and the value of expected future contributions undeterminable. The plaintiffs argue that these two amendments to the formula in La. R.S. 11:103 have allowed the unfunded accrued liability to continue to grow and that the growth of the unfunded accrued liability is inconsistent with the mandate to maintain actuarial soundness. Finally, the plaintiffs complain that this system is unfair because the employers have no say in granting benefits, authorizing cost-of-living increases or investing the assets of the retirement system, all factors which could cause the employers' contribution rate to rise under the formula.
As previously stated, Act 792 of 1997 amended La. La. R.S. 11:103(B)(1) and (3)(a) and (C)(1). Act 792 did not change the already existing employer contribution rate setting formula.[121] The changes in *853 La. R.S. 11:103 made pursuant to Act 792 of 1997 did not change the statute into an expenditure driven employer contribution rate formula. Plan expenditures, including benefits and administrative expenses, have always been one factor in the overall rate setting equation. The amendments to the statute did not change the nature of the formula, the amendments merely clarified some of the factors of the formula.
Act 1293 of 1997 amended La. R.S. 11:103(C)(2)(b) to clarify that the "fixed" portion of the net direct employer's contribution is not "fixed" as the sole portion of the direct employer's contribution to the system but is actually a "targeted" portion of the direct employers' contribution. In addition, the legislature enacted La. R.S. 11:103(C)(2)(b)(iv) to provide that the "targeted" rate was to be treated as a "fixed" rate unless a higher or lower rate results from application of the entire formula.
Contrary to the district court's conclusions, the combination of Acts 792 and 1293 did not cause the employer contribution rate to float to cover future expenditures and benefits; these acts clarified that the employers' contribution rate does float, and always has.[122] The statute has always required the employer contribution rate to be higher or lower if the circumstances warranted.[123] As previously explained, that is the nature of a defined benefits plan, i.e. the shortfalls of the system are balanced by increases in the employers' contribution rate.[124]
La. Const. art. 10, ง 29(E)(3) requires the legislature to determine for public retirement systems the required contributions of employees, employers, and dedicated taxes. The legislature does this by statute, as previously explained. In addition, La. Const. art. 10, ง 29(E)(3) requires that the legislature must include in its considerations the elimination of the unfunded accrued liability as of the end of the 1988-1989 Fiscal Year, by the year 2029.
*854 The "unfunded accrued liability" ("UAL") of a public retirement system is described in the 2001 Legislative Auditor's Actuarial Report as:
that portion of the actuarial accrued liability that is not funded by the system's Valuation Assets on the valuation date. Normally, as of each valuation date, it consists of the unamortized value of the initial unfunded accrued liability (IUAL) and the unamortized values of supplemental accrued liabilities that may be generated each year. These supplemental liabilities originate through actuarial gains or losses, changes in actuarial assumptions or funding methods, and any changes in benefit structures. The UAL is amortized according to the payment methods and periods specified by statute. Under some actuarial cost methods, supplemental accrued liabilities are not amortized and are funded as future normal cost payments.[125]
Contrary to the plaintiffs' contention, the evidence shows the legislature is working to eliminate the unfunded accrued liability of the FRS. The annual calculation of the employer contribution rate includes the determination of the amortization of the unfunded accrued liability in order to ascertain the year's payment.[126] In addition, the legislature in 2003 enacted La. R.S. 11:103(D), which, effective with the June 30, 2002 valuation, "combined, offset and reamortized" all outstanding amortization bases in existence on June 30, 2002, exclusive of merger bases, over the period ending June 30, 2029, with level dollar payments. Thus, the legislature has taken actions to ensure that the unfunded accrued liability be eliminated by the constitutionally-required deadline of the year 2029.
La. Const. art. 10, ง 29(E)(4) prohibits the state and the governing authority of each state and statewide public retirement system from taking "any action that shall cause the actuarial present value of expected future expenditures of the retirement system to exceed or further exceed the sum of the current actuarial value of assets and the actuarial present value of expected future receipts of the retirement system...." The evidence shows that there have been no actions taken relative to the FRS which have violated this constitutional requirement. The annual actuarial valuations performed from 1989 through 2002 and admitted into evidence show that the actuarial present value of expected future expenditures of the system, i.e. the benefits which will be paid in the future to the system's members, have not exceeded or have equaled the sum of the actuarial value of the assets added to the present value of expected future contributions.[127] Thus, *855 this constitutional requirement has been achieved by the FRS.
The amendments to La. R.S. 11:103 at issue here are not responsible for the existence of unfunded accrued liabilities in the FRS. Some actuarial funding methods create unfunded accrued liabilities, some do not. The actuarial funding method set by statute for the FRS creates unfunded accrued liabilities.[128]
Nor did the amendments to La. R.S. 11:103 cause the unfunded accrued liability in the FRS to grow. The evidence shows the unfunded accrued liability in the FRS has grown as the result of several factors, but primarily due to the exponential growth of the system over the time period at issue. As the FRS merged with local firefighter retirement systems, the FRS absorbed the unfunded accrued liabilities of the individual local retirement systems. As the FRS took on more and more systems, the unfunded accrued liability of the system grew. In addition, the FRS membership more than doubled in the time period at issue, meaning that future benefits that must be accounted for has grown, as well. During the same time period, the FRS experienced under-performance of its investments. The record indicates the increase in the unfunded accrued liabilities, and the need for an increase in the employer contributions, was anticipated even in the late 1980's, when the investments were doing well.[129]
The presence or growth of unfunded accrued liabilities in the actuarial equation is not inconsistent with the constitutional requirement that the public retirement systems maintain actuarial soundness. The unfunded accrued liability is but one factor in the multi-level formula for determining actuarial soundness of the system. To focus on one factor in the multi-level formula to the exclusion of the other 40 or 50 factors and without the proper context is error. The one factor of the unfunded accrued liability taken alone, or the increase of it, does not destroy actuarial soundness.[130] An increasing unfunded accrued liability is nevertheless consistent with maintaining actuarial soundness provided there is a funding structure present to liquidate the liability. A floating employer contribution rate as determined by La. R.S. 11:103, which increases the assets of the system to offset increased liabilities, helps the current funding structure of the FRS to achieve this.
The plaintiffs' other contentions are without merit, as well. The plaintiffs' *856 claim that the floating employer contribution rate would make the value of assets and the value of future contributions undeterminable is refuted by the fact that the system actuaries perform that determination annually. In addition, the plaintiffs' complaint that they have no input into the retirement system is not entirely accurate. Two of the eight trustees on the board of the FRS directly represent the interest of the employers of FRS members. Both the executive director of the Louisiana Municipal Association, and a mayor appointed by the Louisiana Municipal Association that has a fire department participating in the system, are on the FRS board of trustees.[131] Moreover, to the extent that the plaintiffs seek a change in the legislative allocation of responsibility for the funding of the FRS or input into the system itself, the plaintiffs must address those complaints to the legislature, and not to the judiciary.
Ultimately, the legislature is responsible for maintaining the actuarial soundness of the system. The legislature has sole discretion within its funding authority to determine by which method it will maintain actuarial soundness of the statewide public retirement systems, including increased employer contribution rates, amendments to the formula described in La. R.S. 11:103, or direct assistance from the state. The legislature has shown by its actions that it is actively monitoring the public retirement systems. The legislative auditor conducts periodic actuarial valuations of the retirement systems.[132] The legislative auditor recommends improvements to the systems to the legislature and points out any problems which are perceived through the audit. The 2003 amendment enacting La. R.S. 11:103(D), through which the legislature combined, offset and reamortized all outstanding amortization bases in the FRS until 2029, exhibits the legislature's close scrutiny of the FRS system. Finally, on June 30, 2002, the legislature appropriated an additional $4,500,000 to the FRS "for the purpose of subsidizing the increase in the employer contribution rate (from 9.00% to 18.255) that was recommended by the Public Retirement Systems' Actuarial Committee for fiscal year ending June 30, 2003."[133]
For the foregoing reasons, the district court's conclusion that Acts 792 and 1293 of 1997 are unconstitutional violations of La. Const. art. 10, ง 29(E)(3) and (4) are reversed.[134]

Injunctive Relief
The plaintiffs' request for injunctive relief was based on their allegations that: (1) the only statute which applied to set the employer contribution rate to the FRS was La. R.S. 11:2262(D)(1), which fixed the rate of employer contribution at 9%; or (2) the statutory provisions detailing the funding mechanism of the FRS, and legislative acts making various amendments to those statutes, violated the Louisiana Constitution. Based on these allegations, the plaintiffs sought to enjoin the state and the FRS from collecting or demanding an employer contribution rate of more than the 9% provided in La. R.S. 11:2262(D)(1) under either their statutory or constitutional argument. Instead, this court has determined that the formula provided in La. *857 R.S. 11:103 is applicable to determine the employer contribution rate to the FRS and that the statutory funding mechanism of the FRS and the cited amendments to the statutes setting forth that mechanism are constitutional. Thus, there is no basis for the plaintiffs' claimed entitlement to injunctive relief.
We acknowledge the evidence presented by the plaintiffs which detailed the serious impact on government employers' budgetary considerations and delivery of essential services which rising employer contribution rates to the FRS may occasion in the future.[135] However, as stated herein, these considerations are more properly presented to the legislature, and not in the judicial forum.

CONCLUSION
Based on the foregoing analysis, this court finds that there is no conflict between the provisions of La. R.S. 11:103 and La. R.S. 11:2262(D)(1); that there has been no improper delegation of legislative authority to the PRSAC in La. R.S. 11:103 and La. R.S. 11:104; that Act 645 of 1991, Act 397 of 1991 and ง 2 of Act 1160 of 2001 do not violate La. Const. art. 10, ง 29(E)(5); that Acts 792 and 1293 of 1997 do not violate La. Const. art. 10, ง 29(E)(3) and (4); and that La. R.S. 11:103 and La. R.S. 11:104 are constitutional both facially and as applied to the Firefighters' Retirement System. So finding, the district court's judgment is affirmed in part and reversed in part, and the permanent injunction enjoining the Firefighters' Retirement System from collecting an amount in excess of nine percent from any employer whose employees are members of the Firefighters' Retirement System is hereby lifted.[136]
AFFIRMED IN PART; REVERSED IN PART; PERMANENT INJUNCTION LIFTED.
*858 CALOGERO, C.J., and WEIMER, J., concurs and assign reasons.
KNOLL, J., dissents and assigns reasons.
WALTER I. LANIER, Justice Ad Hoc, concurs in part, dissents in part, and assigns reasons.
CALOGERO, Chief Justice, concurring:
This decision rejects a constitutional challenge to the system set up by the Louisiana Legislature for the purpose of fulfilling its responsibilities relative to the Firefighters' Retirement System, a Louisiana constitutional obligation to "establish a method of actuarial valuation to be employed" to attain and maintain the actuarial soundness of each state and statewide retirement systems, as required by Art. 10, ง 29(E)(1). Under the system put in place by the Legislature and approved by this court in this case, the Firefighters Retirement System is funded by three sources: (1) contributions of employees equal to eight percent of salary excluding overtime, (2) dedicated tax revenues from a pool of seven-tenths of one percent of the Insurance Premium Tax Fund that the Firefighters Retirement System shares with two other retirement systems, and (3) contributions from the firefighters' employers[1] that vary from year to year in the amount necessary to make up the difference between the amounts collected from the first two sources and the amounts needed to achieve actuarial soundness.[2]
I write separately for the purpose of pointing out that, despite the fact that the system adopted by the Legislature is not unconstitutional as written or as applied (for the reasons more fully explained in the majority opinion), the record facts in this case demonstrate that the system, as it is currently structured, places a difficult, if not impossible, burden on firefighters' employers that could easily become insurmountable in the coming years. In fact, the system today presents a threat to the fiscal integrity and survival of many of these employers who are plaintiffs in this action, if that has not already occurred. Of course, the Legislature has the power and authority to structure the system (and the solution) as it deems wise, provided it responds to the Constitutional mandate to attain and maintain actuarial soundness of the system. The variety of options is as broad as legislators' ingenuity will permit, however restricted that may be by the political realities, be it by appropriation of necessary additional monies from the State's general fund, tapping different and additional tax sources, adjusting the required respective contributions as are currently in place, or any other permissible legal changes affecting the funding of the Firefighters' Retirement System.
WEIMER, J., concurring in part.
I concur in the result and agree with the concurrence of Chief Justice Calogero. Additionally, I agree with the concurrence of Justice ad hoc Lanier which addresses the effect of the repeal of the statutory state guarantee.
KNOLL, Justice, dissenting.
This case concerns the percentage rate local government employers with employees in the Firefighters Retirement System ("FRS") must contribute to the FRS. For the following reasons, I respectfully dissent *859 from the majority opinion and find under a statutory analysis the more specific provisions of La. R.S. 11:2262(D)(1) prevail over the general provisions of La. R.S. 11:103. I therefore would reverse the district court's declarations of unconstitutionality, vacate the permanent injunction, and remand this case to the district court for further proceedings.
I find it appropriate to first comment that I recognize this is a difficult case with an intricate statutory history. The statutory scheme itself is difficult reading and tends to be problematic in application. The district court's task was made more difficult by the plaintiffs' alternative attack raising serious constitutional issues, some of which were extraneous to the determination of the employer contribution rate, which is the sole focus of the plaintiffs' litigation. The extraneous issues pertaining to the funding of the FRS have no bearing in determining the employer rate of contribution. The district court's ruling on these extraneous issues constituted dicta and were premature. Thus, I would reverse and set aside these rulings of unconstitutionality. Having said this, I will address how, in my view, the employer contribution rate is resolved under a statutory analysis.
Title 11 of the Louisiana Revised Statutes, known as the "Louisiana Public Retirement Law," consolidates "public retirement law [into one title] in order to effectively comply with the mandate of Article X, Section 29(E) of the Constitution of Louisiana to maintain public retirement systems on a sound actuarial basis." La. R.S. 11:1 (2004). Within this title exist two statutes which appear to govern employer contributions to the FRS, namely, La. R.S. 11:103(C) and 11:2262(D)(1).
Defendants rely upon La. R.S. 11:103 to support their claim that the employer contribution rate to the FRS is a fluctuating nine percent rate, whereas, the plaintiffs rely upon La. R.S. 11:2262(D)(1) to support their assertion the employer contribution rate to the FRS is a strict, mandatory nine percent rate. Arguably, it appears both parties are correct in their assertions.
La. R.S. 11:103(C) provides:
C. The net direct actuarially required employer contribution for each fiscal year, commencing with fiscal year ending 1997, shall be that dollar amount equal to the contribution rate specified in Subparagraph (2)(b) of Subsection C, if any, increased by the cost itemized in Paragraph C(1), reduced by the contributions itemized in Paragraph C(2), rounded to the nearest one-quarter percent:
(1) The gross required employer contribution as provided in Paragraph B(1) of this Section.
(2) Elements of the gross employer contributions:
(a) Dedicated ad valorem taxes and revenue sharing funds.
(b) Targeted portion of the net direct employer's contributions:
(i) Firefighters' Retirement System โ 9%
(ii) Municipal Police Employees' Retirement System โ 9%
(iii) Sheriffs' Pension and Relief Fund โ 7%
(iv) Each rate set forth in this Subparagraph is to be treated as a fixed rate unless a higher or lower rate results from application of the provisions of this Section in its entirety.
(c) Dedicated assessments against insurers. Such amounts, excluding amounts paid for funding of mergers, to be the lesser of available funds or cost stated in C(1) reduced by contributions *860 stated in C(2)(a) and C(2)(b) but in no event shall be less than zero. (Emphasis added).
La. R.S. 11:2262(D) provides, in pertinent part:
D. Pension accumulation fund
The pension accumulation fund shall be the fund in which shall be accumulated all reserves for the payment of all pensions and benefits payable from contributions made by employers. Contributions to and payments from the pension accumulation fund shall be made as follows:
(1) In addition to the assessment collected above, each municipality, parish, or fire protection district which has employees on its fire protection force who become members in the Firefighters' Retirement System shall contribute an amount equal to nine percent of the earnable compensation excluding overtime but including state supplemental pay, of each firefighter eligible for membership in the Firefighters' Retirement System and shall remit this amount monthly to the Firefighters' Retirement System. (Emphasis added).
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the Legislature. La. Civ.Code art. 9 (2004); Lockett v. State, Through Dept. of Transp. and Development, 03-1767, p. 3 (La.2/25/04), 869 So.2d 87. Reading the statutory provisions as written, La. R.S. 11:103 sets forth a formula devised to calculate the employer's contribution to the FRS and describes the nine percent rate at issue in this case as a "targeted portion." La. R.S. 11:103(C) also allows its targeted portion/rate to fluctuate higher or lower if a higher or lower rate results from application of the provisions of La. R.S. 11:103 in its entirety. In essence, La. R.S. 11:103(C) provides for a fluctuating target rate.
On the other hand, La. R.S. 11:2262(D)(1) specifically provides "each municipality, parish, or fire protection district ... shall contribute an amount equal to nine percent of the earnable compensation...." Because the word "shall" is mandatory, this statutory provision creates a strict nine percent employer contribution rate, rather than a rate that can fluctuate higher or lower. See La. R.S. 1:3 (2004). Under La. R.S. 11:2262(D)(1), an employer has to pay the nine percent rate, because the La. R.S. 11:2262(D)(1) nine percent rate cannot fluctuate. Accordingly, there does appear to be a conflict between these two provisions.
Contrarily, the district court found: "La. R.S. 11:2262(D)(1) sets a target rate, which the formula in La. R.S. 11:103 strives to meet. The combination of the two companion statutes allows the actuary to target the baseline under La. R.S. 11:2262(D)(1) while concurrently preserving the right to ultimately formulate the rate under La. R.S. 11:103." Thus, it held: "La. R.S. 11:2262(D) and 11:103 must be read together as setting a nine percent target rate that may fluctuate higher or lower." I find this reasoning flawed. In order to achieve this compatibility between the two statutes, the words "baseline" or "minimum" have to replace the word "shall" in La. R.S. 11:2262(D)(1) as though "shall" did not exist in the wording of 11:2262(D)(1), which clearly provides the employers: shall contribute an amount equal to nine percent. The majority opinion simply expounds upon this error. Of importance, La. R.S. 11:103(C)(2)(b)(iv) does not preserve the mandatory nine percent rate required in La. R.S. 11:2262(D)(1), because it specifically provides " *861 each rate set forth in this Subparagraph is to be treated as a fixed rate unless a higher or lower rate results from the application of the provisions of this Section in its entirety." The specific provisions of section 11:103(C)(2)(b) do not apply because the employer contribution rate is specifically provided for in 11:2262(D)(1) at a mandatory rate of nine percent. Reading the statutes together and replacing the "shall" with "baseline" or "minimum" allows the employer contribution rate to rise above the mandated nine percent rate as in this case, or even fall below the nine percent rate, rendering the mandatory nine percent rate of La. R.S. 11:2262(D)(1) completely ineffective.
Significantly, the district court reached this conclusion because it found the application of La. R.S. 11:3 would resolve the issue. The court stated "an important statute to consider in resolving the issue at hand is La. R.S. 11:3." This is where the district court fell into error and skewed its reasoning. La. R.S. 11:3 sets forth the rules of interpretation a court must employ when a conflict exists between the provisions contained in Title 11 and the provisions contained in separate laws, i.e., laws outside of Title 11. The mandatory fixed nine percent rate of La. R.S. 11:2262(D)(1) and the targeted fluctuating rate of La. R.S. 11:103 are not contained in separate laws; both laws are contained in Title 11. The issue of the proper rate to apply, i.e., the fixed nine percent or the fluctuating rate, is a conflict within Title 11. Therefore, La. R.S. 11:3 is not applicable.
Because the district court relied upon La. R.S. 11:3, a discussion of the history of 11:3 is appropriate, which further demonstrates why it is not applicable in resolving the employer contribution rate. La. R.S. 11:3 was enacted in 1988 by 1988 La. Acts 81 along with La. R.S. 11:103. At that time, the provisions now designated as La. R.S. 11:2262(D)(1) were contained in La. R.S. 33:2160(D)(1), and until 1991 when the Legislature redesigned La. R.S. 33:2160(D)(1) as La. R.S. 11:2262(D)(1), these provisions existed outside of Title 11 as separate laws. Further problematic with the district court's reliance upon La. R.S. 11:3 is there was never a conflict between La. R.S. 11:103(C)(2)(b) and La. R.S. 33:2160, because at the time of its enactment La. R.S. 11:103(C)(2)(b) provided:
(b) Fixed portion of the net direct employer contributions:
(i) Firefighters' Retirement System โ 9%
(ii) Municipal Police Employees' Retirement System ...
(iii) Sheriffs' Pension and Relief Fund ...
Therefore, both La. R.S. 11:103(C)(2)(b) and La. R.S. 11:2262(D)(1) provided for a strict, fixed nine percent employer contribution rate, and neither provided for a targeted fluctuating rate.
The conflict between La. R.S. 11:103(C)(b)(2) and La. R.S. 11:2262(D)(1) did not arise until 1997, when the Legislature enacted 1997 La. Acts 1293, which amended La. R.S. 11:103(C)(2)(b), in the introductory paragraph, by substituting "Targeted" for "Fixed" and added item (C)(2)(b)(iv). At the time the conflict arose, the provisions of La. R.S. 11:2262(D)(1) no longer existed as separate laws outside of Title 11, making La. R.S. 11:3 inapplicable to resolve the conflict. Apparently, the district court felt that La. R.S. 11:103(C)(b)(2) has always provided as it does today for a fluctuating rate, and this would further explain why the district court fell into error.
The district court reasoned that "interpreting La. R.S. 11:2262 as being the sole, mandatory contribution rate of employers *862 would, in effect, render the formula for actuarial soundness found in La. R.S. 11:103 meaningless...." On the other hand, interpreting the mandatory rate provided in La. R.S. 11:2262(D)(1) as a targeted fluctuating rate would, in effect, render the legislative mandated fixed nine percent rate meaningless.
The bottom line is the statutory conflict between La. R.S. 11:2262(D)(1) and 11:103(C)(2)(b)(iv) governing the employer contribution rate to the FRS is the problematic issue to resolve.
One of the ways to allow the La. R.S. 11:103 formula to apply to the FRS is for this Court to interpret the enactment of 1997 La. Acts 1293 as an implied repeal of La. R.S. 11:2262, the fixed rate. Under general rules of statutory construction, the latest expression of the legislative will is considered controlling and prior enactments in conflict are considered as tacitly repealed in the absence of an express repealing clause. La. Civ.Code art. 8 (2004); State v. Board of Com'rs of Caddo Levee Dist., 188 La. 1, 175 So. 678 (1937); Norman J. Singer, Sutherland Statutes and Statutory Construction ง 23:9 (6th ed.2002). In accordance with such construction, La. R.S. 11:103(C)(2)(b)(iv) would be controlling in this matter as the latest substantive expression of legislative will. Consequently, the enactment of La. R.S. 11:103(C)(2)(b)(iv) in 1997 La. Acts 1293 would act as an implied repeal of La. R.S. 11:2262(D)(1).
However, this interpretation is problematic because a presumption exists against the implied repeal of a statute, founded upon the doctrine the Legislature is presumed to envision the whole body of the law when it enacts new legislation. See Norman J. Singer, Sutherland Statutes and Statutory Construction ง 23:10, 487 (6th ed.2002); see also, Lockett, 03-1767 at p. 5. When a newly enacted statute is silent on a previously existing statute, the indication is the Legislature did not intend to repeal the existing statute. Singer, supra, ง 23:10, p. 487. Furthermore, there is also the assumption that existing statutory law is representative of popular will, and this too reinforces the presumption against its alteration or repeal. Singer, supra, ง 23:10, p. 487.
In this case, 1997 La. Acts 1293 is silent as to La. R.S. 11:2262, i.e., it does not expressly repeal La. R.S. 11:2262(D)(1). To further bolster this position I note that significantly, La. R.S. 11:2262(D) has been amended as if La. R.S. 11:2262(D)(1) was not repealed. See 719 La. Acts 2003. Although this enactment did occur after the filing of this suit, the trial court referred to and considered Act 719 in its reasons for judgment. In Act 719, the legislature amended and reenacted La. R.S. 11:2262(D)(2) to correct two citations of law regarding recovery of delinquent contributions that erroneously referred to previously repealed statutes, i.e. former La. R.S. 33:2160(D)(1) which was redesignated by the Legislature in 1991 La. Acts 74 as La. R.S. 11:2262. Although technical in nature, this reenactment now limits the right of the Firefighters' Retirement System to pursue collection of delinquent employer contributions to suits for collection of the employer contribution required by La. R.S. 11:2262(D)(1), which is "nine percent of the earnable compensation ... of each firefighter eligible for membership in the FRS."
With the presumption against implied repeal in mind, the court must determine if there is a statutory analysis that would reconcile both provisions, giving effect to each, and thereby avoiding an implied repeal.
La. Civ.Code art. 13 provides, where two statutes deal with the same subject matter, they should be harmonized if possible. *863 Kennedy v. Kennedy, 96-0732, p. 3 (La.11/25/96), 699 So.2d 351, 358. However, if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character. Kennedy, 96-0732 at p. 3, 699 So.2d at 358. In this case, La. R.S. 11:103 acts as a general statute governing employer contributions to all"state and statewide public retirement systems whose benefits are not guaranteed by Article X, Section 29(A) and (B) of the Louisiana Constitution," whereas La. R.S. 11:2262(D)(1) acts as an exception to La. R.S. 11:103's general provisions. This provision specifically governs the contributions to the pension accumulation fund of "each municipality, parish or fire protection district which has employees on its fire protection force who become members in the FRS...." A literal reading of both statutes reveals La. R.S. 11:2262(D)(1) is more specific than La. R.S. 11:103(C) to the facts of this case which specifically involves the employer contributions of municipalities, parishes, and fire protection districts to the FRS.
Additionally, such an interpretation allows La. R.S. 11:103 to retain its authority as a general provision, which will apply in all "unguaranteed" state and statewide retirement system cases unless there exists a legislative mandated rate, as in this case. Indeed, the Legislature has enacted laws which specifically require the employers who do not have a mandated fixed rate to make contributions based upon the amounts determined under La. R.S. 11:103, such as La. R.S. 11:2227(D)(1)(a), mandating "each municipality which has employees on its police force who become members in [the Municipal Police Employees'] retirement system shall contribute the employer contribution rate as determined in R.S. 11:103...." Moreover, this interpretation maintains the effectiveness of the La. R.S. 11:2262(D)(1) mandatory, fixed nine percent rate.
The majority opinion, like the district court, erroneously reads these two statutes as compatible. While the majority's reasoning is persuasive, it is flawed. The majority reads into the statutes "what the legislature understood" and reads out the mandatory employer contribution provision of La. R.S. 11:2262(D)(1) as though it is part of a fluctuating rate in La. R.S. 11:103. This interpretation essentially reads out the language of La. R.S. 11:103(C)(2)(b)(iv) allowing a lower rate for the net direct employer contributions if a "lower rate results from application of the provisions of this Section in its entirety," and effectively misinterprets the mandatory fixed rate of nine percent as though it was a baseline or minimum. Such a reading is an absurd interpretation because it allows the employer contribution rate to far exceed the mandatory nine percent rate clearly intended by the Legislature.
In turn, the absurd consequences resulting from this interpretation will cause local municipalities to severely cut, if not eliminate, fire protection to its citizens so it can pay retirement benefits. Clearly, these absurd consequences were not intended by the Legislature.
The majority opinion fails to recognize one of the fundamental tenets of statutory interpretation namely, statutory interpretation cannot result in absurd consequences and must give way to a reasonable result. Indeed, this is the positive law on statutory interpretation in our Civil Code: Laws should be applied as written and no further interpretation may be made in search of the intent of the legislature when the law is clear and unambiguous and its application does not lead to absurd consequences. La. Civ.Code. art. 9. The function of the court is to interpret the laws so as to give them the meaning which the *864 lawmakers obviously intended them to have and not to construe them so as to give them absurd or ridiculous meanings. Webb v. Parish Council of Parish Of East Baton Rouge, 217 La. 926, 47 So.2d 718, 720 (1950). In construing a statute, the object is to ascertain legislative intent, and where literal construction would produced absurd results, the letter must give way to the spirit of the law, and the statute construed so as to produce a reasonable result. Bradford v. Louisiana Public Service Comm'n, 189 La. 327, 179 So. 442, 446 (1938).
The problems concerning the actuarial soundness of the FRS were not caused by the employers of the firefighters. But yet under the majority interpretation, the municipality with its limited resource for funds is now held responsible to make the FRS actuarially sound. In my view, the FRS has raised serious constitutional issues against the state in their pending cross-claim[1] against the State that should be heard and disposed of on remand to the district court.
In conclusion, I find La. R.S. 11:2262(D)(1) prevails in this matter as an exception to the general provisions of La. R.S. 11:103. I would reverse the district court's declarations of unconstitutionality, vacate the permanent injunction, and remand this matter to the district court for further proceedings on the FRS's cross-claim.
WALTER I. LANIER, Jr., Justice Ad Hoc, concurring in part and dissenting in part.
I agree that (1) the net employer's contribution rate to the FRS shall be fixed by PRSAC on an annual basis pursuant to the formula set forth in La. R.S. 11:103; (2) the net employer's contribution rate provided for in La. R.S. 11:103 is a variable or fluctuating annual rate that may be fixed above or below 9% as financial circumstances may require and that the variable rate is designed to eliminate deficiencies or excesses in the annual funding of the actuarial soundness of the FRS; (3) because the net employer's contribution rate for the FRS is such a variable, the judgment of the trial court permanently enjoining the FRS from collecting a net employer's contribution in excess of 9% is in error and should be reversed; (4) the legislative delegation of authority to PRSAC found in La. R.S. 11:103, 104 and 121 et seq. is not unconstitutional and the trial court declaratory judgment to the contrary should be reversed; and (5) the questioned acts of the legislature and the statutes they amended are facially constitutional and the trial court declaratory judgments to the contrary should be reversed.
I agree that Act 645 of 1991 that repealed La. R.S. 33:2165 is facially constitutional. The majority opinion does not fully discuss the effect of the repeal. *865 Accordingly, I concur with reasons on this issue.
I do not agree with the majority's disposition of the issue of whether La. R.S. 11:103 and 104 were unconstitutionally applied and/or administered. Accordingly, I dissent on this issue with reasons.

EFFECT OF REPEAL OF STATUTORY STATE GUARANTEE
La. R.S. 33:2165, renumbered as La. R.S. 11:2269, provided that "(t)he state of Louisiana hereby guarantees benefits payable to a member of this system or a retiree or to his lawful beneficiary." Members, retirees and beneficiaries are separate categories of persons provided for differently in the FRS. See definitions in La. R.S. 11:2252. Black's Law Dictionary, p. 711 (7th Ed.1999) defines a guarantee as "(t)he assurance that a contract ... will be carried out." A state guarantee is backed by the "full faith and credit" of the state. Vol. 9, Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Dec. 5, 1973, comments of Delegate Aertker on page 2565 and Delegate Lowe on page 2575. Thus, a guarantee is a nominate, accessory contract of suretyship as provided for in La. C.C. art 3035, et seq.
The following appears in the section entitled "State Guarantee Repealed" in the majority opinion:
The legislature repealed former La. R.S. 33:2165 in its entirety pursuant to Acts 1991, No. 645, effective July 1, 1991. This Act repealed the state guarantee of benefits to FRS members and their beneficiaries. After the effective date of this act, the formula described in La. R.S. 11:103, applicable to public retirement systems whose benefits were not guaranteed by the state, and not the formula in La. R.S. 11:102, applicable to state guaranteed systems, was used for the calculation of the employer contribution to the retirement system.
(Footnote deleted).
A review of Act 645 of 1991 shows that it does not expressly state that it is intended to be retroactive. Accordingly, as a matter of statutory construction, it cannot be given retroactive effect. La. R.S. 1:2; La. C.C. art. 6; R. Lamonica and J. Jones, 20 La. Civ. Law Treatise, Legislative Law and Procedure, ง 6.4, pp. 113-125 (2004). Further, as a matter of constitutional law, an act of the legislature may not be applied retroactively if it would impair contractual obligations or disturb vested rights. Smith v. Board of Trustees of Louisiana State Employees Retirement System, 2002-2161, p. 7 (La.6/27/03), 851 So.2d 1100, 1105.
It is not completely accurate to say that Act 645 of 1991 repealed the state statutory guarantee of benefits or that the FRS became a public retirement system whose benefits are not guaranteed by the state after the enactment of Act 645 of 1991. After the effective date of Act 645, the state's guarantee (suretyship) remained in full force and effect for the members, retirees and beneficiaries of the FRS who had accrued (vested) benefits prior to the effective date of the Act. Only those benefits [retirement rights] that accrued after the effective date of the Act are no longer covered by the state guarantee. The Act had no effect on the state's guarantee of benefits that accrued prior to the effective date of the act because of statutory and constitutional law.
Finally, the repeal of this statutory guarantee does not control whether La. R.S. 11:102 or 11:103 applies to the FRS as asserted by the majority opinion. That issue is controlled by whether or not the FRS is a state or statewide system whose *866 benefits are constitutionally guaranteed by La. Const. art. X, ง 29(B). See La. Const. art. X, ง 29(A), (B), (E)(2) and (E)(3) and La. R.S. 11:102 A and 11:103 A.

WERE LA. R.S. 11:103 AND 104, AS AMENDED, UNCONSTITUTIONALLY APPLIED AND/OR ADMINISTERED
The record on appeal reveals serious questions about how the funding formula for the FRS has been administered in the past. In addition, I agree with the observation of Chief Justice Calogero in his concurring opinion that the funding formula for the FRS, as it is currently structured, "places a difficult, if not impossible, burden on firefighters' employers that could easily become insurmountable in coming years." (Emphasis added).
La. C.C. P. art. 1876 provides as follows:
The court may refuse to render a declaratory judgment or decree where such judgment or decree, if rendered, would not terminate the uncertainty or controversy giving rise to the proceeding.
After considering how the FRS funding formula was administered in the past, how it is currently structured, and what may be the potential future problems, it is my opinion that a declaratory judgment on this issue will not reasonably terminate the uncertainty or controversy involved. This issue should be decided by a full trial on the merits in an ordinary proceeding; a declaratory judgment on it should not be rendered.
Accordingly, I respectfully dissent from the majority ruling on this issue.
NOTES
[*] Retired Judge Walter I. Lanier, Jr., assigned as Justice ad hoc, sitting in place of Associate Justice Bernette J. Johnson, recused.
[1] The original plaintiffs in this action consist of the following association and political subdivisions: Louisiana Municipal Association; the Parish of Jefferson, Louisiana; and the cities of Abbeville, Alexandria, Bossier City, Crowley, DeRidder, Jonesboro, Kaplan, Kenner, Leesville, Minden, Morgan City, Natchitoches, New Iberia, Pineville, Ponchatoula, Port Allen, Ruston and Sulpher, Louisiana. After the filing of the original petition, various fire districts and other local government employers of firefighters filed petitions to intervene as plaintiffs: St. George Fire Protection District No. 2; the Central Fire Protection District No. 4; Fire Protection District 4-A; the Lafayette City-Parish Consolidated Government; the Terrebonne Parish Consolidated Government; and the cities of Bastrop, Bogalusa, Eunice, Hammond, Harahan, Haughton, Lake Charles, Monroe, Opelousas, St. Gabriel, Shreveport, Westlake, West Monroe, Winnsboro, and Zachary, Louisiana. All but two of these "intervening plaintiffs," along with the original plaintiffs, appear as petitioners in the amended and restated petition. See Vol. 5, p. 1002-1034. St. George Fire Protection District No. 2 and Central Fire Protection District No. 4 maintained separate petitions; however, these plaintiffs adopted the arguments of the Amended and Restated Petition. See Vol. 5, p. 868-871 and Vol. 6, p. 1108-1111. All of these parties will be referred to as "plaintiffs" in this opinion.
[2] As will be discussed in greater detail in this opinion, the district judge specifically found the following: Act 645 of 1991, Act 397 of 1991 and Section 2 of Act 1160 of 2001 violate La. Const. art. 10, ง 29(E)(5); Acts 792 and 1293 of 1997 violate La. Const. art. 10, ง 29(E)(3) and (4).
[3] La. R.S. 33:2151(A)(1980); currently La. R.S. 11:2251. As will be discussed, infra, the statutory provisions of the FRS were later re-designated in Title 11. Where appropriate, both the statute as enacted, and as currently found, will be cited.
[4] La. R.S. 33:2158(A) (1980); currently La. R.S. 11:2260.
[5] La. R.S. 33:2158(C) (1980); currently La. R.S. 11:2260(C).
[6] Acts 1979, No. 434, ง 3; La. R.S. 36:769(D)(8)(1980).
[7] See Vol. 1, p. 81, Legislative Auditor Report, November 2002; Vol. 8, p. 1608, Independent Auditor's Report, 1994; and Vol. 13, p. 2233. The record in this case consists of thirteen (13) volumes. Citations to the record will designate the volume and page number. In addition, there is a problem with the Bates-numbering in Volume 13. The Bates-numbering follows sequentially from Vol. 12 until page number 2269. The page numbering then jumps to page numbers 2198 and 2199. Thereafter, the page numbering starts over at page number 2200-2208, when it jumps again to page number 2270-2274. The page numbering then begins again sequentially from page number 2209. In order to ensure understanding of the record citations, the volume number, page number and speaker will be identified where appropriate.
[8] La. R.S. 33:2155(1980); currently La. R.S. 11:2256; see also Vol. 13, p. 2233.
[9] See Vol. 13, p. 2233.
[10] See La. R.S. 33:2160(B)(1), (D)(1) and (D)(6) (1980); currently La. R.S. 11:2262. Another source of funds for the FRS, although not a main source of funding, is the interest which accrues on investment of FRS assets.
[11] La. R.S. 33:2160(A) (1980); currently La. R.S. 11:2262.
[12] The Annuity savings fund and the Pension accumulation fund are discussed in the body of the opinion. The three other sub-funds are: (1) the Annuity reserve fund, which is comprised of the amounts accumulated in the Annuity savings fund and Pension accumulation fund when a FRS member retires; (2) the Expense fund, which is funded by the Pension accumulation fund and/or interest on investments; and (3) the Deferred Retirement Option Plan account, in which is accumulated all payments made pursuant to the FRS deferred retirement option plan. La. R.S. 33:2160(C), (D)(4), (E) (1980), currently La. R.S. 11:2262(C), (E) and (G); Acts 1980, No. 178, ง 1; Acts 1984, No. 450; La. R.S. 33:2155.1 (1984).
[13] La. R.S. 33:2160(B)(1)(a) (1980); currently La. R.S. 11:2262(B).
[14] Acts 1991, No. 397, ง 1 reduced the rate of the employee contribution to the FRS from 8% to 7%. However, the rate of the employee contribution was raised again to 8% in the following year in Acts 1992, No. 253, ง 1. See La. R.S. 11:2262(B)(1).
[15] La. R.S. 33:2160(B)(1)(a) (1980); currently La. R.S. 11:2262(B)(2).
[16] La. R.S. 33:2160(D) (1980); currently La. R.S. 11:2262(D).
[17] La. R.S. 33:2160(D)(1) and (3) (1980) provided:

(1) In addition to the assessment collected above [i.e. the employee contributions to the Annuity savings fund], each municipality, parish or fire protection district which has employees on its fire protection force who become members in the Firefighters' Retirement system shall contribute an amount equal to nine percent of the earnable compensation of each firefighter eligible for membership in the Firefighters' Retirement System and shall remit this amount monthly to the Firefighters' Retirement System.
* * *
(3) On the basis of regular interest and of such mortality and other tables as shall be adopted by the board of trustees, the actuary engaged by the board to make each valuation required by this Subpart during the period over which the accrued liability contribution is payable, immediately after making such valuation, shall determine the uniform and constant percentage of the compensation of the average new entrant, which if contributed on the basis of compensation of such new entrant throughout the entire period of active service would be sufficient to provide for the payment of any pension payable on his account. The rate percentum so determined shall be known as the "normal contribution" rate. After the accrued liability contribution has ceased to be payable, the normal contribution rate shall be the rate percentum of the earned salary of all members obtained by deducting from the total liabilities of the pension accumulation fund the amount of funds on hand to credit of that fund and dividing the remainder by one percentum of the present value of the prospective future salaries of all members as computed on the basis of the mortality and service tables adopted by the board of trustees and regular interest. The normal rate of contributions shall be determined by the actuary after each valuation.
Currently, these provisions are in La. R.S. 11:2262(D)(1) and (3).
[18] Acts 1979, No. 434, ง 2 provided:

ง 1419. Commission expense fund; assessments against insurers; dedications
A. It shall be the duty of the commission to determine an amount sufficient to enable it to pay the expenses of its organization and operation, and the salaries and expenses of its members and employees, and to pay any other expenses which may be necessary in the conduct of its business and for the enforcement of the provisions of this part. The commissioner of insurance shall be paid sixty thousand dollars annually from the fund for the operating fund of his office, payments to be made monthly. An expense fund in the amount so determined by the commission shall be provided by all insurers doing business in this state and subject to this part, by the payment of an assessment to be levied against them by the commission in proportion to their gross direct premiums received in this state in the preceding year, less returned premiums, provided, that no such assessment shall exceed one percent of such premiums, and further provided that, regardless of the percentage assessed by the commission, an amount equal to four-tenths of one percent of the gross direct premiums received in this state, in the preceding year, by insurers doing business in this state and subject to this Part, less returned premiums shall be deposited by the commission with the state treasurer to the account of the Municipal Police Employees' Retirement system, and an amount equal to one-tenth of one percent of the gross direct premiums received in this state, in the preceding year, by insurers doing business in this state and subject to this Part, less returned premiums shall be deposited by the commission with the stat treasurer to be paid to the account of the Firefighters' Retirement System. Any insurer which has not had one full year of experience immediately preceding said assessment, shall pay a sum to be fixed by the commission, and the following years its proportion shall be based upon its estimated premiums for the current year, subject to revision at the end of the year in accordance with the gross premiums received by said insurer, as hereinabove provided.
[19] Id.
[20] Id.
[21] La. R.S. 33:2160(D)(4) (1980); currently La. R.S. 11:2262(D)(6).
[22] At trial, the legislative auditor, Mr. Sondergaard, explained that the benefits of a "state" retirement system are guaranteed by the state, while the benefits of a "statewide" retirement system are not guaranteed by the state. See Vol. 13, p. 2274. The primary responsibility for funding a guaranteed system lies with the state. A system not guaranteed by the state may use a variety of funding mechanisms, such as direct contributions from employers and employees, ad valorem taxes, dedicated taxes and revenue sharing. See Vol. 4, p. 793.
[23] Due to the fact that the legislature repealed the state guarantee of benefits to the FRS, discussed infra, these requirements are not at issue here.
[24] La. Const. art. 10, ง 29(E) states as follows:

(E) Actuarial Soundness. (1) The actuarial soundness of state and statewide retirement systems shall be attained and maintained and the legislature shall establish, by law, for each state or statewide retirement system, the particular method of actuarial valuation to be employed for purposes of this Section.
[Due to the fact that the legislature repealed the state guarantee of benefits, discussed infra, the provisions of Subsection (2), applicable to state-guaranteed public retirement systems, are not applicable here.]
(3) For statewide public retirement systems not covered by Paragraphs (A) and (B) of this Section, the legislature shall determine all required contributions to be made by members, contributions to be made by employers, and dedicated taxes required for the sound actuarial maintenance of the systems, including the elimination of the unfunded accrued liability as of the end of the 1988-1989 Fiscal Year, under the method of valuation selected under (1) above, by the year 2029, commencing with Fiscal Year 1989-1990.
(4) For all state and statewide public retirement systems, neither the state nor the governing authority of such system shall take any action that shall cause the actuarial present value of expected future expenditures of the retirement system to exceed or further exceed the sum of the current actuarial value of assets and the actuarial present value of expected future receipts of the retirement system, except with respect to the following:
(a) Normal business operating expenses of the retirement system.
(b) Capital outlay expenditures of the retirement system.
(c) Management of investments of the retirement system.
(d) Cost-of-living increases to retirees, as provided by law, provided the retirement system is approaching actuarial soundness as provided by law, and the granting of such increase does not cause an increase in the actuarially required contribution rate.
(5) All assets, proceeds, or income of the state and statewide public retirement systems, and all contributions and payments made to the system to provide for retirement and related benefits shall be held, invested as authorized by law, or disbursed as in trust for the exclusive purpose of providing such benefits, refunds, and administrative expenses under the management of the boards of trustees and shall not be encumbered for or diverted to any other purpose. The accrued benefits of members of any state or statewide public retirement system shall not be diminished or impaired. Future benefit provisions for members of the state and statewide public retirement systems shall only be altered by legislative enactment.
[25] Acts 1988, No. 81, ง 2; Title 11, Chapter 1, ง 1; La. R.S. 11:1.
[26] La. R.S. 11:2.
[27] Acts 1988, No. 81, ง 1.
[28] Acts 1988, No. 81, ง 2, Title 11, Chapter 1, ง 3; La. R.S. 11:3.
[29] Acts 1988, No. 81, ง 2, Chapter 2, Part 1, ง 11; La. R.S. 11:11.
[30] Acts 1988, No. 81, ง 2, Chapter 2, Part 2, Subpart A, ง 22; La. R.S. 11:22(B)(4) established that the actuarial valuation method for the FRS is "entry age normal."
[31] Acts 1988, No. 81, ง 2, Chapter 2, Part 2, Subpart B, ง 42; La. R.S. 11:42(B)(3) provides that the unfunded accrued liability of the FRS as of June 30, 1989, shall be amortized over a thirty year period, commencing with fiscal year ending 1990, with level dollar payments annually.
[32] Acts 1988, No. 81, ง 2, Chapter 2, Part 2, Subpart C; La. R.S. 11:62(3) provided the employee contribution rate for the FRS was 8%. This coordinates with the percentage as was reflected in R.S. 33:2160(B)(1)(a) (1980).
[33] Acts 1988, No. 81, ง 2, Chapter 2, Part 2, Subpart E, ง 101; La. R.S. 11:101.
[34] La. R.S. 11:102, as enacted in Acts 1977, No. 81, provides as follows:

ง 102. Employer contributions; determination; payment; state and statewide public retirement systems whose benefits are guaranteed by Article X, Section 29(A) and (B) of the Louisiana Constitution
A. The provisions of this Section are applicable with respect to state and statewide public retirement systems whose benefits are guaranteed by Article X, Section 29(A) and (B) of the Louisiana Constitution.
B. (1) For each fiscal year, commencing with fiscal year 1989-1990, for each of the public retirement systems referenced in Subsection A of this Section, the legislature shall set the required employer contribution rate equal to the actuarially required employer contribution, as determined under Paragraph (3) of this Subsection, divided by the total projected payroll of all active members of each particular system for the fiscal year. Each entity funding a portion of a members salary shall also fund the employer's contribution on that portion of the member's salary at the employer contribution rate specified in this Subsection.
(2) At the end of each fiscal year, the difference between the actuarially required employer contribution for the fiscal year, as determined under Paragraph (3) of this Subsection, and the amount of employer contributions actually received for the fiscal year, excluding any amounts received for the extraordinary purchase of additional benefits or service, shall be determined.
(a) If the amount of employer contributions received for the fiscal year is less than the actuarially required employer contribution for the fiscal year, due to the failure of the legislature to appropriate funds at the required employer contribution rate, the difference shall be paid by the state treasurer from the state general fund upon warrant from the governing authority of the retirement system.
(b) Differences occurring for any other reason, together with interest computed thereon at the actuarially assumed rate to the middle of the next fiscal year, shall be added to the following fiscal year's actuarially required employer contribution if the difference was an underpayment and shall be subtracted from the following fiscal year's actuarially required employer contribution if the difference was an overpayment.
(3) With respect to each public retirement system referenced in Subsection A of this Section, the actuarially required employer contribution for each fiscal year, commencing with fiscal year 1989-1990, shall be that dollar amount equal to the sum of:
(a) The employer's normal cost for that fiscal year, computed as of the first of the fiscal year using the system's actuarial funding method as specified in R.S. 11:22 and taking into account the value of future accumulated employee contributions and interest thereon, such employer's normal cost projected to the middle of that fiscal year at the actuarially assumed interest rate.
(b) That fiscal year's payment, computed as of the first of that fiscal year and projected to the middle of that fiscal year at the actuarially assumed interest rate, using the system's amortization method specified in R.S. 11:42, necessary to amortize the unfunded accrued liability as of June 30, 1988, such unfunded accrued liability computed using the system's actuarial funding method as specified in R.S. 11:22.
(c) In the case of an underpayment in the previous fiscal year that has not been paid by the treasurer, such previous year's underpayment. In the case of an overpayment in the previous fiscal year, a negative amount equal in absolute value to the previous fiscal year's overpayment.
(d) That fiscal year's payment, computed as of the first of that fiscal year and projected to the middle of that fiscal year at the actuarially assumed interest rate, necessary to amortize changes in actuarial liability due to:
(i) Actuarial gains and losses, if appropriate for the funding method used by the system as specified in R.S. 11:22, for each fiscal year commencing after June 30, 1988, such payments to be computed as level dollar amounts over a period of fifteen years from the year of occurrence of each such actuarial gain or loss, such gains and losses to include any increases in actuarial liability due to governing authority granted cost-of-living increases.
(ii) Changes in actuarial assumptions or the method of valuing of assets, such payments to be computed as level dollar amounts over a period of fifteen years from the year of occurrence of the change.
(iii) Changes in actuarial funding methods, excluding changes in methods of valuing of assets, such payments to be computed as level dollar amounts over a period of thirty years from the year of occurrence of the change.
(iv) Changes in actuarial accrued liability, computed using the actuarial funding method as specified in R.S. 11:22, due to legislation changing plan provisions, such payments to be computed in the manner and over the time period specified in the legislation creating the change or, if not specified in such legislation, as level dollar amounts over a period of fifteen years from the year of occurrence of the change.
[35] See La. R.S. 11:102(B)(2).
[36] See La. R.S. 11:102(B)(2)(a).
[37] See Vol. 13, p. 2274 (testimony of Mr. Sondergaard, legislative auditor).
[38] La. R.S. 11:103, as enacted in Acts 1988, No. 81, provided as follows:

ง 103. Employer contributions; determination; payment; state and statewide public retirement systems whose benefits are not guaranteed by Article X, Section 29(a) and (B) of the Louisiana Constitution
A. The provisions of this Section are applicable with respect to those state and statewide public retirement systems whose benefits are not guaranteed by Article X, Section 29(A) and (B) of the Louisiana Constitution.
B. (1) For each fiscal year commencing with the fiscal year ending 1990, for each public retirement system referenced in Subsection A of this Section, the employer contribution rate shall equal the actuarially required employer contribution as determined under paragraph (3) of this subsection, divided by the total projected payroll of all active members of the particular system for the fiscal year, such rate to be rounded to the nearest one-quarter of one percent.
(2) At the end of each fiscal year, the difference between the actuarially required employer contribution for the fiscal year, as determined under Paragraph (3) of this Subsection by the most recent actuarial valuation, and the amount of the employer contributions actually received for the fiscal year, excluding any amounts received for the extraordinary purchase of additional benefits or service, shall be determined to be that fiscal year's short fall amount.
(3) The actuarially required employer contribution for each fiscal year, commencing with fiscal year ending 1990, shall be that dollar amount equal to the sum of:
(a) The employer's normal cost for that fiscal year, computed as of the first of the fiscal year using the system's actuarial funding method as specified in R.S. 11:22 and taking into account the value of employee contributions and dedicated funds, including interest thereon, such employer's normal cost projected to the middle of the fiscal year at the assumed actuarial interest rate.
(b) The projected noninvestment related administrative expenses for the fiscal year.
(c) That fiscal year's payment, computed at the first of that fiscal year and projected to the middle of that fiscal year, at the actuarially assumed interest rate necessary to amortize previous years' shortfall amounts, if any, as a level dollar amount over a period of five years from the date of occurrence.
(d) That fiscal year's payment, computed as of the first of that fiscal year using that system's amortization method specified in R.S. 11:42, necessary to amortize the unfunded accrued liability as of the end of the fiscal year ending 1989, such unfunded accrued liability computed using the system's actuarial funding method as specified in R.S. 11:22, such payment projected to the middle of that fiscal year at the actuarially assumed interest rate.
(e) That fiscal year's payment, computed as of the first of that fiscal year and projected to the middle of that fiscal year at the actuarially assumed interest rate, necessary to amortize changes in actuarial liability due to:
(i) Actuarial gains and losses, if appropriate for the funding method used by the system as specified in R.S. 11:22, for each fiscal year commencing with the fiscal year ending 1990, such payments to be computed as level dollar amounts over a period of fifteen years from the year of occurrence of each such actuarial gain or loss, such gains and losses to include any increases in actuarial liability due to governing authority granted cost-of-living increases.
(ii) Changes in actuarial assumptions of the method of valuing of assets, such payments to be computed as level dollar amounts over a period of fifteen years from the year of occurrence of the change.
(iii) Changes in actuarial funding methods, excluding changes in methods of valuing of assets, such payments to be computed as level dollar amounts over a period of thirty years from the year of occurrence of the change.
(iv) Changes in actuarial accrued liability, computed using the actuarial funding method as specified in R.S. 11:22, due to legislation changing plan provisions, such payments to be computed in the manner and over the time period specified in the legislation creating the change or, if not specified in such legislation, as level dollar amounts over a period of fifteen years from the year of occurrence of the change.
[39] See La. R.S. 11:103(B)(2).
[40] See La. R.S. 11:103(B)(3)(c).
[41] Acts 1988, No. 81, ง 2, Chapter 3, ง 121(A); La. R.S. 11:121(A)(1988). The other provisions of the Act would become effective on July 1, 1989, provided that the PRSAC became effective on July 1, 1988. See Acts 1988, No. 81, Section 5. The effective dates of the provisions were staggered in this way so that the PRSAC could accomplish its statutorily mandated duties for implementation of the formulas set forth in the Act for the next fiscal year.
[42] Acts 1988, No. 81, ง 2, Chapter 3, ง 121(B).
[43] Acts 1988, No. 81, ง 2, Chapter 3, ง 127(A). The statutorily-described duties of PRSAC have not been amended.
[44] Acts 1988, No. 81, ง 2, Chapter 3, ง 127(B).
[45] Acts 1988, No. 81, ง 2, Chapter 3, ง 127(C). The mechanism as originally enacted has survived in substantially the same form, except that the requirement of unanimous consent has been amended to require only a majority of the members present and voting. The present form of La. R.S. 11:127(C) is as follows:

C. The actuaries for the public retirement systems, plans, or funds and the legislative actuary shall submit annual actuarial valuations to the committee. The committee shall review and analyze all the assumptions and valuations submitted. The committee shall, with the consent of a majority of members present and voting, approve a single valuation for each public retirement system, plan, or fund. Once consent of the members is obtained, the actuarial valuations in the form of the official valuations adopted by the committee shall be submitted to the Joint Legislative Retirement Committee and the Joint Legislative Committee on the Budget.
[46] Acts 1991, No. 74, ง 1.
[47] The four main state retirement systems are: (1) the Louisiana State Employees' Retirement System, La. R.S. 11:401 et seq.; (2) the Teachers' Retirement System of Louisiana, La. R.S. 11:701 et seq.; (3) the Louisiana School Employees' Retirement System, La. R.S. 11:1001 et seq.; and (4) the State Police Pension and Retirement System, La. R.S. 11:1301 et seq. There are two other state retirement systems which have limited participation, if any. The Judges' Non-Contributory Plan, La. R.S. 11:1351 et seq., is applicable with respect to judges and certain enumerated court officers who were in office on October 1, 1976 and who did not timely exercise the option to become a member of the Louisiana State Employees' Retirement System. In addition, the system of pensions for Confederate veterans and the widows of Confederate veterans was merged and consolidated with the system of financial assistance to aged and needy persons. See La. R.S. 11:1391 et seq., see also Vol. 3, p. 471, Vol. 4, p. 786-787.
[48] The nine statewide retirement systems are: (1) the Assessors' Retirement Fund, La. R.S. 11:1401 et seq.; (2) the Clerks' of Court Retirement and Relief Fund, La. R.S. 11:1501 et seq.; (3)the District Attorneys' Retirement System, La. R.S. 11:1581 et seq.; (4) the Municipal Employees' Retirement System of Louisiana, La. R.S. 11:1731 et seq.; (5) the Parochial Employees' Retirement System of Louisiana, La. R.S. 11:1901 et seq.; (6) the Registrars of Voters Employees' Retirement System, La. R.S. 11:2031 et seq.; (7) the Sheriffs' Pension and Relief Fund, La. R.S. 11:2171 et seq.; (8) the Municipal Police Employees' Retirement System, La. R.S. 11:2211 et seq.; and (9) the Firefighters' Retirement System, La. R.S. 11:2251 et seq. See also Vol. 3, p. 471, Vol. 4, p. 786-787.
[49] Acts 1991, No. 74, ง 3, Title 11, Subtitle III, Chapter 9.
[50] Acts 1991, No. 74, ง 4.
[51] Acts 1991, No. 74, ง 6 provided: "This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided in Article III, Section 18 of the Constitution of Louisiana." The Act was approved by the Governor on June 25, 1991.
[52] As will be discussed, infra, prospectively from the repeal of former La. R.S. 33:2165, any shortfall in the annual determination of the actuarially required employer contribution and the employer contribution actually received must be met by a funding method other than direct payment from the state general fund, as determined by the legislature.
[53] La. R.S. 11:103(C), as enacted in Acts 1991, No. 397, provides:

ง 103. Employer contributions; determination; payment not guaranteed
* * *
C. The net direct actuarially required employer contribution for each fiscal year, commencing with fiscal year ending 1990, shall be that dollar amount equal to the contribution rate specified in Subsection (C)(2)(b), if any, increased by the cost itemized in Subsection (C)(1), reduced by the contributions itemized in Subsection (C)(2):
(1) Elements of cost contained in the gross required employer contribution include the employer's normal cost for that fiscal year, computed as of the first of the fiscal year using the system's actuarial funding method as specified in R.S. 11:22 and taking into account the value of employee contributions, including interest thereon, such employer's normal cost projected to the middle of the fiscal year at the assumed actuarial interest rate.
(2) Elements of the gross employer contributions:
(a) Dedicated ad valorem taxes and revenue sharing funds.
(b) Fixed portion of the net direct employer's contributions:
(i) Firefighters' Retirement System โ 9%
(ii) Municipal Police Employees' Retirement System โ 9%
(iii) Sheriffs' Pension and Relief Fund โ 5%
(c) Dedicated assessments against insurers. Such amounts, excluding amounts paid for funding of mergers, to be the lesser of available funds or cost stated in (C)(1) reduced by contributions stated in (C)(2)(a) and (C)(2)(b) but in no event shall be less than zero.
[54] It is important to this discussion to remember that the gross employer contribution, the contributions which are placed into the Pension accumulation sub-fund of the FRS, are derived from both the direct employer contributions and the dedicated IPTF tax revenues. Thus, there is a difference between the "gross employer contribution," which refers to both the employer contribution and the IPTF funds, and the "net direct employer contribution," which refers only to the contribution obtained directly from the employers.
[55] Other public retirement systems whose benefits are not guaranteed by the state have different funding structures. Some do not receive IPTF funds; others rely on ad valorem taxes. This formula is applicable to all the public retirement systems whose benefits are not guaranteed by the state to determine the amount of the net direct actuarially required employer contribution rate.
[56] The provisions of La. R.S. 11:104, as enacted by Acts 1991, No. 1038, are:

ง 104. Employer contributions; determination date; notification
A. The employer contribution rate as referred to in this Subpart shall be determined by the Public Retirement Systems' Actuarial Committee by the fifteenth day of January of each year, except for those systems that have a fiscal year ending on the thirtieth day of June.
B. Within ten business days thereafter, the chairman of the Public Retirement Systems' Actuarial Committee shall notify each employer or retirement system that the referenced rate will be recommended to the legislature for approval, or that the given rate shall be used by the employer or retirement system, whichever is appropriate under the provisions contained in R.S. 11:102 and 103.
[57] The amendments to La. R.S. 11:103(B)(1) and (3)(a) and (C)(1), pursuant to Acts 1997, No. 792, are as follows:

ง 103. Employer contributions; determination; payment not guaranteed
* * *
B. (1) For each fiscal year commencing with the fiscal year ending 1990, for each public retirement system referenced in Subsection A of this Section [those not guaranteed by the state], the employer contribution rate shall equal the actuarially required employer contribution as determined under Paragraph (3) of this Subsection, divided by the total projected payroll of all active members of the particular system for the fiscal year. Active member payroll shall include participants in the Deferred Retirement Option Plan, but only if direct employer contributions are made based on salaries for such participants.
* * *
(3) The actuarially required employer contribution for each fiscal year, commencing with fiscal year ending 1997, shall be that dollar amount equal to the sum of:
(a) The employer's normal cost for that fiscal year, computed as of the first of the fiscal year using the system's actuarial funding method as specified in R.S. 11:22 and taking into account the value of employee contributions, including interest thereon, such employer's normal cost projected to the middle of the fiscal year at the assumed actuarial interest rate.
* * *
C. The net direct actuarially required employer contribution for each fiscal year, commencing with fiscal year ending 1997, shall be that dollar amount equal to the contribution rate specified in Subparagraph (2)(b) of Subsection C, if any, increased by the cost itemized in Paragraph C(1), reduced by the contributions itemized in Paragraph C(2), rounded to the nearest one-quarter percent:
(1) The gross required employer contribution as provided in Paragraph B(1) of this Section.
* * *
[58] Also including the 9% rate for the Municipal Police Employees' Retirement System and the 5% rate for the Sheriffs' Pension and Relief Fund.
[59] The provisions of La. R.S. 11:103(C)(2)(b) and 11:103(C)(2)(b)(iv), as amended and enacted, respectively, pursuant to Acts 1997, No. 1293, are:

ง 103. Employer contributions; determination; payment not guaranteed
* * *
C.
* * *
(2)
* * *
(b) Targeted portion of the net direct employer's contributions:
* * *
(iv) Each rate set forth in this Subparagraph is to be treated as a fixed rate unless a higher or lower rate results from application of the provisions of this Section in its entirety.
* * *
[60] Prior to the 1991 amendment, the Municipal Police Employees' Retirement System received a dedicated four-tenths of one percent of the IPTF. See Acts 1979, No. 434, ง 2.
[61] Prior to the 1991 amendment, the Sheriffs' Pension and Relief Fund received a dedicated one-tenth of one percent of the IPTF. See Acts 1979, No. 434, ง 2.
[62] La. R.S. 22:1419, as amended by Acts 1991, No. 397, provided as follows:

ง 1419. Assessments against insurers; dedications
A. It shall be the duty of the commission to determine an amount sufficient to enable it to pay the expenses of its organization and operation, and the salaries and the expenses of its members and employees, and to pay any other expenses which may be necessary in the conduct of its business and for the enforcement of the provisions of this Part. Sufficient funds in the amount so determined by the commission shall be provided by all insurers doing business in this state and subject to this Part, by the payment of an assessment to be levied against them by the commission in proportion to their gross direct premiums received in this state in the preceding year, less returned premiums. No such assessment shall exceed one percent of such premiums. Regardless of the percentage assessed by the commission, an amount equal to seven-tenths of one percent of the gross direct premiums received in this state, in the preceding year, by insurers doing business in this state and subject to this Part, less returned premiums shall be deposited by the commission with the state treasurer to the account of the Municipal Police Employees' Retirement System, the Sheriffs' Pension and Relief Fund, and the Firefighters' Retirement System for the exclusive use of these retirement systems or funds, first, in meeting the remaining portion of the actuarially required contributions after receipt of the employee contributions at the rate established in R.S. 11:62(3), (6), and (9), after receipt of the employer contributions at the rate established in R.S. 11:103(C), and after receipt of all dedicated funds and taxes referred to in R.S. 11:103(C)(2)(a), in the amounts determined by the Public Retirement Systems' Actuarial Committee. Second, the assessment shall be used for funding of mergers of local retirement systems or funds with these statewide systems or funds, such mergers to be funded over a period of thirty years, unless the Public Retirement Systems' Actuarial Committee deems a shorter period appropriate. Such shorter period shall not use more than five percent of the total assessment in any one year, nor shall the aggregate of all mergers being funded in any one year use more than twenty-five percent of the total assessment in any one year. After payment of the amounts established by the Public Retirement Systems' Actuarial Committee to the retirement systems, all remaining funds shall be remitted to the state general fund. Any insurer which has not had one full year of experience immediately preceding said assessment, shall pay a sum to be fixed by the commission, and the following years its proportion shall be based upon its estimated premiums for the current year, subject to revision at the end of the year in accordance with the gross premiums received by said insurer, as hereinabove provided.
[63] La. R.S. 22:1419(A)(3) and (4), as amended by Acts 2001, No. 1160, ง 2, provides:

ง 1419. Assessments against insurers; dedications
A.
* * *
(3) Regardless of the percentage assessed by the commission, an amount equal to seven-tenths of one percent of the gross direct premiums received in this state, in the preceding year, by insurers doing business in this state and subject to this Part, less returned premiums shall be deposited by the commission with the state treasurer on behalf of the Municipal Police Employees' Retirement System, the Sheriffs' Pension and Relief Fund, and the Firefighters' Retirement System for the exclusive use of these retirement systems and allocated as follows:
(a)(i) First, the assessment shall be used for funding the mergers of local retirement systems with these statewide retirement systems, such mergers to be funded over a period of thirty years, unless the Public Retirement Systems' Actuarial Committee deems a shorter period appropriate. Such shorter period shall not use more than five percent of the total assessment in any one year, nor shall the aggregate of all mergers being funded in any one year use more than twenty-five percent of the total assessment in any one year.
(ii) One million five hundred thousand dollars of the twenty-five percent of the total assessment which is allocated for the purpose of mergers shall be expended first to fund the annual actuarial cost incurred by the State Police Pension and Retirement System with regard to implementation of the Act which originated as House Bill No. 495 of the 2001 Regular Session of the Legislature, and this one million five hundred thousand dollars shall be expended prior to the funding of any mergers.
(b)(i) Second, any funds that remain after the allocations provided for in Subparagraph (a) of this Paragraph shall be used as provided for in Item (ii) of this Subparagraph, in meeting the remaining portion of the actuarially required contributions after receipt of the employee contributions at the rate established in R.S. 11:62(3), (6), and (9), after receipt of the employer contributions at the rate established in R.S. 11:103(C), and after receipt of all dedicated funds and taxes referred to in R.S. 11:103(C)(2)(a), in the amounts determined by the Public Retirement systems' Actuarial Committee.
(ii)(aa) Any funds that remain after the allocations provided for in Subparagraph (3)(a) of this Paragraph shall be divided into three thirds and, then, a one-third portion shall be allocated separately to each of the three systems. Except as otherwise provided in this Item, each such system shall not receive a greater portion than one-third.
(bb) It is hereby acknowledged that any one system may not need the entire one-third portion that it receives each year to meet the remaining portion of its actuarially required contributions. In that event, any unused allocated funds shall be reallocated to such other system or systems of the three systems that have a need for additional funds to meet the remaining portion of the actuarially required contributions.
(cc) If one system does not need its total annual allocated portion, but two other systems do use their total annual allocated portions to meet the remaining portion of the actuarially required contributions and need additional funds for that purpose, then the unused allocated portion of the system that did not use its total annual allocated portion shall be divided equally between the two systems that need additional funds to meet the remaining portion of their actuarially required contributions, except that any funds not needed by either such system shall be reallocated to the other such system to meet the remaining portion of the actuarially required contributions.
(dd) Funds that are reallocated to a system pursuant to Subitem (bb) or (cc) of this Item shall be limited to the amount that is necessary to meet the remaining portion of the actuarially required contributions of the receiving system.
(c) The phrase "retirement system" or "system" as used in Paragraphs (3), (4), and (5) of this Subsection shall include the Sheriffs' Pension and Retirement Fund, as applicable, notwithstanding that it is technically a retirement fund and not a retirement system.
(4) After payment of the amounts established by the Public Retirement Systems' Actuarial Committee to the retirement systems as provided for in Paragraph (3) of this Subsection, all remaining funds shall be remitted to the state general fund.
* * *
[64] Vol. 4, p. 731.
[65] Vol. 4, p. 776.
[66] Vol. 4, p. 778.
[67] Written Reasons For Judgment, Vol. 10, p. 1939-1940.
[68] See footnote 1.
[69] Amended and Restated Petition, Vol. 5, p. 1027, ถ 90B.
[70] Amended and Restated Petition, Vol. 5, p. 1027, ถถ 92A-92B, 103(A).
[71] Amended and Restated Petition, Vol. 5, p. 1027, ถถ 93A-93C, 103(B).
[72] Amended and Restated Petition, Vol. 5, p. 1028-1029, ถถ 94A-95D, 103(C), 103(D).
[73] Amended and Restated Petition, Vol. 5, p. 1029-1030, ถถ 96A-96D, 103(E).
[74] Amended and Restated Petition, Vol. 5, p. 1030, ถ 97, 103(F).
[75] Amended and Restated Petition, Vol. 5, p. 1030-1031, ถ 100.
[76] Amended and Restated Petition, Vol. 5, p. 1031, ถ 101.
[77] Vol. 5, p. 1042-1044.
[78] Vol. 6, p. 1112.
[79] Vol. 6, p. 1199-1200.
[80] Vol. 6, p. 1185-1187. The state also answered the separate petitions of the two other plaintiffs not joining in the Amended and Restated Petition.
[81] Vol. 6, p. 1126-1139.
[82] See Vol. 11, p. 1983.
[83] Vol. 6, p. 1184.
[84] This last finding of the district court was not appealed by any party and is not before us. The district court properly found that Acts 792 and 1293 of 1997 did not violate La. Const. art. 6, ง 14(A) or La. Const. art. 7, ง 14(A). The district court correctly rejected the plaintiffs' claim that increases in the employer contribution rate demanded from local government employers are not for retirement benefits. As the increases in the employer contribution rate are clearly for retirement benefits, the provisions of La. Const. art. 6, ง 14(B)(5) makes the cited constitutional provisions inapplicable. See Vol. 10, p. 1961-1962, 1965.
[85] Vol. 10, p. 1039-1965.
[86] See Vol. 10, p. 1966-1971. La. R.S. 13:4431 provides:

In any case where any district court has granted any restraining order, preliminary injunction, permanent injunction, or other process which may restrain the execution or enforcement of any provision of the constitution or of any act, law or resolution of the legislature of Louisiana, the defendant or defendants or any person or persons affected thereby, may suspensively appeal the order or judgment to the court of competent appellate jurisdiction.
[87] The consolidated plaintiffs filed a brief in opposition and a post-hearing brief. St. George Fire Protection District No. 2 and Central Fire Protection District No. 4 filed separate briefs in opposition, primarily adopting the brief of the consolidated plaintiffs.
[88] Under La. R.S. 11:3, in the absence of a conflict between a statute in Title 11 and separate laws governing state and statewide public retirement systems, the separate laws continue to be operable.
[89] To the extent that the trial judge made factual findings in reaching its legal conclusions on the interpretation of the statutes at issue, we find that any factual determinations inconsistent with the findings expressed in this opinion are manifestly erroneous. Hall v. Folger Coffee Co., XXXX-XXXX p. 9 (La.4/14/04), 874 So.2d 90, 98.
[90] La. R.S. 11:103(A).
[91] La. R.S. 11:103(B)(1).
[92] La. R.S. 11:103(B)(3).
[93] In 1989 and 1990, the report specifically stated in its "Summary of Principal Plan Provisions," "Employer contribution's are determined annually based on results of the valuation of the prior fiscal year with adjustments for any dedicated tax monies or appropriated funds." Vol. 2, p. 226, 258. Starting in 1991, this section of the annual actuarial report was even more specific: "Net direct employer contributions are nine percent (9%) of earnable compensation unless the funds allocated from dedicated taxes are insufficient to provide the actuarially required contributions or the actuarially required contributions are less than 9%." See Vol. 2, p. 285 (Valuation as of June 30, 1991); Vol. 2, p. 313 (Valuation as of June 30, 1992); Vol. 2, p. 347 (Valuation as of June 30, 1993); Vol. 2, p. 385 (Valuation as of June 30, 1994); Vol. 2, p. 418 (Valuation as of June 30, 1995); Vol. 3, p. 454 (Valuation as of June 30, 1996); Vol. 3, p. 560 (Valuation as of June 30, 1997); Vol. 3, p. 601 (Valuation as of June 30, 1998); Vol. 3, p. 643 (Valuation as of June 30, 1999); Vol. 4, p. 682 (Valuation as of June 30, 2000); Contribution Rates page missing from Valuation as of June 30, 2001; Vol. 4, p. 766 (Valuation as of June 30, 2002).
[94] Vol. 3, p. 472.
[95] La. R.S. 33:2160(D)(6) (1980).
[96] Although the district judge did not allow Mr. Curran to testify about his inferences regarding the FRS statutes, see infra at page 834, he did allow Mr. Curran to testify as to what he actually does. See Vol. 13, 2232.
[97] Vol. 13, p. 2231.
[98] When asked if actuarial soundness could be attained and maintained by having contribution rates that remain level over an extended period of time, the FRS actuary, Mr. Curran, testified as follows:

"... To have a sound plan on an actuarial basis, you have to have sufficient support for that plan on the asset side to offset match against the promised liabilities that have been made. And because of that, you have to respond to conditions as they unfold. There is no way to set out in advance any immutable rate which does not change, because that would presuppose that all the conditions and the components of the plan do not change. Even if the benefit structure would remain the same, the persons that are members of the plan change over time. The parameters which govern their career changes. All of these things must be responded to or reflected to in establishing the contributions; otherwise, you run the risk of having the plan either, on the one hand, piling up unnecessary surplus, or on the other hand, becoming insolvent." Vol. 13, p. 2236.
[99] The Municipal Police Employees' Retirement System and the Sheriffs' Pension and Relief Fund have the same sort of structure as the FRS, where there is a fixed component employer portion, but the fixation is a device used to calculate the variable amount payable on the premium taxes. Vol. 13, p. 2259. The funding sources for these retirement systems, however, are different. Vol. 13, p. 2267.
[100] Acts 1991, No. 74 ง 4.
[101] La. R.S. 11:103 currently provides:

ง 103. Employer contributions; determination; payment not guaranteed
A. The provisions of this Section are applicable with respect to those state and statewide public retirement systems whose benefits are not guaranteed by Article X, Section 29(A) and (B) of the Louisiana Constitution.
B. (1) For each fiscal year commencing with the fiscal year ending 1990, for each public retirement system referenced in Subsection A of this Section, the employer contribution rate shall equal the actuarially required employer contribution as determined under Paragraph (3) of this Subsection, divided by the total projected payroll of all active members of the particular system for the fiscal year. Active member payroll shall include participants in the Deferred Retirement Option Plan, but only if direct employer contributions are made based on salaries for such participants.
(2) At the end of each fiscal year, the difference between the actuarially required employer contribution for the fiscal year, as determined under Paragraph (3) of this Subsection by the most recent actuarial valuation, and the amount of employer contributions actually received for the extraordinary purchase of additional benefits or service, shall be determined to be that fiscal year's short fall amount. (3) The actuarially required employer contribution for each fiscal year, commencing with fiscal year ending 1997, shall be that dollar amount equal to the sum of:
(a) The employer's normal cost for that fiscal year, computed as of the first of the fiscal year using the system's actuarial funding method as specified in R.S. 11:22 and taking into account the value of employee contributions, including interest thereon, such employer's normal cost projected to the middle of the fiscal year at the assumed actuarial interest rate.
(b) The projected noninvestment related administrative expenses for the fiscal year.
(c) That fiscal year's payment, computed at the first of that fiscal year and projected to the middle of that fiscal year, at the actuarially assumed interest rate necessary to amortize previous years' shortfall amounts, if any, in the same manner as provided in Subsection B(3)(e)(i) of this Section if an immediate gain funding method is used; otherwise, amortized over the future working lifetime of current participants.
(d) That fiscal year's payment, computed as of the first of that fiscal year using that system's amortization method specified in R.S. 11:42, necessary to amortize the unfunded accrued liability as of the end of the fiscal year ending 1989, such unfunded accrued liability computed using the system's actuarial funding method as specified in R.S. 11:22, such payment projected to the middle of that fiscal year at the actuarially assumed interest rate.
(e) That fiscal year's payment, computed as of the first of that fiscal year and projected to the middle of that fiscal year at the actuarially assumed interest rate, necessary to amortize changes in actuarial liability due to:
(i)(aa) Except as provided in Subitem (bb), actuarial gains and losses, if appropriate for the funding method used by the system as specified in R.S. 11:22, for each fiscal year commencing with the fiscal year ending 1990, such payments to be computed as level dollar amounts over a period of fifteen years from the year of occurrence of each such actuarial gain or loss, such gains and losses to include any increases in actuarial liability due to governing authority granted cost-of-living increases.
(bb) For the Municipal Police Employees' Retirement System, actuarial gains and losses, if appropriate for the funding method used by the system as specified in R.S. 11:22, for each fiscal year commencing with the fiscal year ending June 30, 2002, such payments to be computed as level dollar amounts over a period of thirty years from the year of occurrence of each such actuarial gain or loss, such gains and losses to include any increases in actuarial liability due to governing authority granted cost-of-living increases.
(ii)(aa) Except as provided in Subitem (bb), changes in actuarial assumptions or the method of valuing of assets, such payments to be computed as level dollar amounts over a period of fifteen years from the year of occurrence of the change.
(bb) For the Municipal Police Employees' Retirement System, changes in actuarial assumptions or the method of valuing of assets, such payments to be computed as level dollar amounts over a period of thirty years from the year of occurrence of the change.
(iii) Changes in actuarial funding methods, excluding changes in methods of valuing of assets, such payments to be computed as level dollar amounts over a period of thirty years from the year of occurrence of the change.
(iv)(aa) Except as provided in Subitem (bb), changes in actuarial accrued liability, computed using the actuarial funding method as specified in R.S. 11:22, due to legislation changing plan provisions, such payments to be computed in the manner and over the time period specified in the legislation creating the change or, if not specified in such legislation, as level dollar amounts over a period of fifteen years from the year of occurrence of the change.
(bb) For the Municipal Police Employees' Retirement System, changes in actuarial accrued liability, computed using the actuarial funding method as specified in R.S. 11:22, due to legislation changing plan provisions, such payments to be computed in the manner and over the time period specified in the legislation creating the change or, if not specified in such legislation, as level dollar amounts over a period of thirty years from the year of occurrence of the change.
(4) At the end of the fiscal year during which the assets, excluding the outstanding balance due to Subparagraph b(3)(c) of this Section, exceed the actuarial accrued liability, the amortization schedules contained in Subparagraphs B(3)(d) and (e) of this Section shall be fully liquidated and assets in excess of the actuarial accrued liability shall be amortized as a credit in accordance with the provisions of Subparagraph B(3)(e) of this Section.
C. The net direct actuarially required employer contribution for each fiscal year, commencing with fiscal year ending 1997, shall be that dollar amount equal to the contribution rate specified in Subparagraph (2)9b of Subsection C, if any, increased by the cost itemized in Paragraph (C)(1), reduced by the contributions itemized in Paragraph (C)(2), rounded to the nearest one-quarter percent:
(1) The gross required employer contribution as provided in Paragraph B(1) of this Section.
(2) Elements of the gross employer contributions: (a) Dedicated ad valorem taxes and revenue sharing funds.
(b) Targeted portion of the net direct employer's contributions:
(i) Firefighters' Retirement System โ 9%
(ii) Municipal Police Employees' Retirement System โ 9%
(iii) Sheriffs' Pension and Relief Fund โ 7%
(iv) Each rate set forth in this Subparagraph is to be treated as a fixed rate unless a higher or lower rate results from application of the provisions of this Section in its entirety.
(c) Dedicated assessments against insurers. Such amounts, excluding amounts paid for funding of mergers, to be the lesser of available funds or cost stated in C(1) reduced by contributions stated in C(2)(a) and C(2)(b) but in no event shall be less than zero.
(d) For the Firefighters' Retirement System of Louisiana, effective with the June 30, 2002, valuation, all outstanding amortization bases in existence on June 30, 2002, exclusive of merger bases, shall be combined, offset, and reamortized over the period ending June 30, 2029, with level dollar payments. This Subsection shall not apply to amortization bases established after June 30, 2002.
[102] See La. R.S. 11:103(C)(2)(b)(i).
[103] See Vol. 13, p. 2232-2233.
[104] The district court's analysis was different in some respects from the analysis presented here. Where the district court found the statutes at issue ambiguous, we find the statutes to be clear and unambiguous. The district court found that La. R.S. 11:2262(D)(1) sets a target rate, which the formula in La. R.S. 11:103 strives to reach. To the contrary, we hold that the statutory scheme is actually the opposite, that La. R.S. 11:2262(D)(1) supplies one of the factors to be used in the formula described in La. R.S. 11:103. Nevertheless, the district court's conclusion, that the statutes do not conflict and must be read together, is correct. See Written Reasons For Judgment, Vol. 10, p. 1943-1949; Judgment, Vol. 10, p. 1964.
[105] As previously stated, any factual findings made by the trial court which conflicts with the holdings of this opinion are specifically found to be manifestly erroneous. See footnote 89.
[106] As stated, the legislature was not unaware that actuarial valuation requires making certain actuarial assumptions. However, the legislature detailed how actuarial assumptions were to be considered under the formula in La. R.S. 11:103(B)(3) for determining the actuarially required employer contribution. Subparagraph (a) sets forth the formula for determining the factor of the employer's normal cost. The computation must use the system's actuarial funding method as specified in the legislature at La. R.S. 11:22. This factor takes into account the value of employee contributions, including interest, and projects such normal cost to the middle of the fiscal year at the assumed actuarial interest rate. Subparagraph(b) adds the factor of the projected noninvestment related administrative expenses for the fiscal year. Subparagraph (c) adds as a factor that fiscal year's payment necessary to amortize the previous year's shortfall amounts at the actuarially assumed interest rate. The legislature directs that if an "immediate gain funding method" is used, the factor should be amortized at the same rate as established in Subparagraph (e)(i) (which provides for amortization over 15 or 30 years, depending on the funding method used), of over the future working lifetime of current participants. Subparagraph (d) adds as a factor that fiscal year's payment necessary to amortize (using that system's amortization method specified in La. R.S. 11:42) the unfunded accrued liability as of the end of the fiscal year ending 1989, computed using the system's actuarial funding method as specified under La. R.S. 11:22 and projected to the middle of that fiscal year at the actuarially assumed interest rate. Subparagraph (e) adds as a factor that fiscal year's payment necessary to amortize changes in actuarial liability due to (i) actuarial gains and losses, (ii) changes in actuarial assumptions or the method of valuing of assets, (iii) changes in actuarial funding methods, and (iv) changes in actuarial accrued liability. At each stage, the legislature has directed how such factors are to be computed, including amortization methods, funding methods and the period of time over which such amounts are to be computed. Subparagraph (e) was amended effective July 2, 2003 to further specify a separate set of instructions for determination of the factors necessary to calculate the actuarially required employer contribution for the Municipal Police Employees' Retirement System at La. R.S. 11:103(B)(3)(e)(i)(bb), (ii)(bb) and (iv)(bb). Acts 2003, No. 1079 ง 1. Although these amendments were not part of the statute at the time suit was filed, the amendments show the legislature's continuing direction and involvement in all aspects of the provisions of the multi-level formula in La. R.S. 11:103.
[107] La. R.S. 11:103(C)(2)(b)(iv).
[108] La. R.S. 11:103(D) now provides:

D. For the Firefighters' Retirement System of Louisiana, effective with the June 30, 2002, valuation, all outstanding amortization bases in existence on June 30, 2002, exclusive of merger bases, shall be combined, offset, and reamortized over the period ending June 30, 2029, with level dollar payments. This Subsection shall not apply to amortization bases established after June 30, 2002.
[109] Vol. 13, p. 2277-2278 (emphasis added).
[110] Plaintiffs' counsel sought to make the point that an actuary uses independent judgment and discretion in performing his function as an actuary. From this broad generalization, plaintiffs argue the PRSAC exercises legislative authority. Yet even under cross-examination, the FRS actuary, Mr. Curran, made clear that the assumptions made by actuaries are discretionary only in a broad sense:

Q: Sir, in practicing your profession of being an actuary, do you feel that you exercise your independent judgment and discretion in arriving at your recommendations?
A: That's part of our job.
Q: And, sir, do you feel that the recommendations that you make and exercise in those independent judgments and discretions are an integral part of arriving at the employer contribution level?
A: Within the structure of the confines of the statute, yes.
Q: And it is true, sir, that you make a number of assumptions based on the exercise of your independent judgment and discretion as an actuary; isn't that true?
A: I wouldn't want to mischaracterize it as independently arrived at, as if there were no input from the relevant historical factors and experience studies that we do. Those assumptions really have to be reality based and based on studies and experience, not exogynous to the process where we just plug them in.
Vol. 13, p. 2287 (emphasis added).
[111] Vol. 13, p. 2300.
[112] Written Reasons for Judgment, Vol. 10, p. 1949-1957; Judgment, Vol. 10, p. 1964.
[113] The trial court's finding that there are not sufficient checks and balances is both legally and factually erroneous.
[114] The district court reasons for judgment held that the state guarantee of benefits was an accrued benefit of the system. Vol. 10, p. 1958 (emphasis supplied). What is constitutionally protected, however, are the accrued benefits of the systems' members.
[115] Not all statewide public retirement systems have the same funding structure. The legislature has chosen in its discretion to fund other statewide systems differently. Some use a combination of employee contributions, employer contributions, ad valorem taxes, dedicated taxes or revenue sharing in order to fund the systems. Vol. 4, p. 801.
[116] Mr. Curran testified that the employer bears the risk in a defined benefit plan. By contrast, the employee bears the risk of market changes in a defined contribution plan. Vol. 13, p. 2233-2235.
[117] Mr. Curran explained that the changing employer contribution rate is the method in which actuarial soundness is achieved and maintained: "Actually, the change in that contribution level is, in fact, the methodology of attaining soundness. The, let's say matching, if you will, of increased income stream to offset those losses is an essential ingredient in maintaining the soundness of the plan. If you don't respond to economic conditions, you run the risk of starving the plan." Vol. 13, p. 2239.
[118] Plaintiffs argued that funds were diverted and that, if FRS had received the influx, the system would be in a more financially sound position. However, actuarial valuation requires a balance, not a surplus. See Vol. 13, p. 2249. Just as the system's liabilities cannot be out of balance, neither can its assets be out of balance. The funding structure, as currently configured, is actuarially sound. The real issue driving the plaintiffs' argument is the fact that greater contribution through dedicated taxes would decrease the annual employer contribution rate.
[119] La. Const. art. 10, ง 29(E)(5) states, in pertinent part, that "[f]uture benefit provisions for members of the state and statewide public retirement systems shall only be altered by legislative enactment." The district court's reliance on Firefighters' Retirement System v. Landrieu, 572 So.2d 1175 (La.App. 1 Cir.1990), writ denied, 575 So.2d 811 (La.1991) ("Landrieu") and Louisiana State Employees' Retirement System v. State, 423 So.2d 73 (La.App. 1 Cir.1982), writ denied, 427 So.2d 1206 (La.1983) ("LASERS"), in holding that the legislature could not make changes to the funding structure, was misplaced. In LASERS, the appellate court held that the contributions of the members and the state contributions once made, no longer belonged to the state, and are held in trust for the members of the retirement system. LASERS stands for the private, as opposed to state, interest in already existing funds being held by the retirement system. In Landrieu, at issue was the state's ability to retain IPTF funds already collected by the State Insurance Rating Commission pursuant to La. R.S. 22:1419(A); the state treasurer refused to remit those already collected funds to the FRS. Neither LASERS nor Landrieu can be read for the proposition that the legislature has no authority to change the way in which future contributions are to be collected or allocated to the FRS.
[120] Written Reasons for Judgment, Vol. 10, p. 1957-1960; Judgment, Vol. 10, p. 1964.
[121] Specifically, Act 792 did the following: (1) relocated the provision requiring mathematical rounding to the nearest quarter of one percent by moving it from Paragraph (B)(1) to Subsection (C) (introductory paragraph); (2) added language in (B)(1) regarding the inclusion of DROP participants in the calculation of active member payroll; (3) updated the dates that employer contributions were to begin being paid under Paragraph (B)(3); (4) removed the provision in Subparagraph (B)(3)(a) regarding inclusion of dedicated funds as one of the factors in the employer's normal costs, because dedicated funds were already defined in Subparagraph (C)(2)(c) as one of the factors used to reduce the employer's gross employer contributions; (5) updated the date that the net actuarially required employer contributions were to begin being calculated in Subsection (C) (introductory paragraph); and (6) eliminated duplicate language regarding the elements of cost contained in the gross required employer contribution in Paragraph (C)(1).
[122] For example, the total or gross employer contribution rate, expressed as a percentage of projected payroll, has not been 9% in these years:

Fiscal Year 2003 36.76%
Fiscal Year 2002 30.75%
Fiscal Year 2001 27.64%
Fiscal Year 2000 20.86%
Fiscal Year 1999 19.76%
Fiscal Year 1998 21.80%
Fiscal Year 1997 21.67%
Fiscal Year 1996 18.08%
Fiscal Year 1995 14.47%
Fiscal Year 1994 10.58%

See Vol. 4, p. 764, "Year to Year Comparison" included in FRS Actuarial Valuation as of June 30, 2002.
[123] That the actual rate directly paid by the employers for all the years prior to 2002 was maintained at 9% was a direct reflection of market forces. Evidence introduced at trial shows that interest on FRS investments was received well above the actuarially assumed rate of 7% for the late 1980's and early 1990's. Since interest on investments, employee contributions and IPTF funds were sufficient to offset the actuarially determined liabilities of the FRS with the direct employer contribution rate at 9%, the direct employer contribution rate did not change. The FRS then began to grow, more than doubling the size of its membership. The actuarially determined liabilities grew, including the increased benefits required for the larger membership compounded by the lower than assumed return on investments. Even though IPTF funds increased, they did not increase at a rate sufficient to balance the increase in actuarial liabilities. IPTF funds, interest on investments and employee contributions became insufficient to "balance" the equation with the direct employer contribution rate at 9%, and the direct employer contribution rate had to rise to achieve actuarial soundness. Vol. 13, p. 2238-2239, 2242.
[124] This fact was confirmed by the legislative actuary. Vol. 13, p. 2206.
[125] Vol. 4, p. 799.
[126] See ex. Vol. 4, p. 751, Exhibit V-Schedule C, "Amortization of Unfunded Actuarial Accrued Liability," FRS Actuarial Valuation as of June 30, 2002.
[127] See Vol. 2, p. 213-215, FRS Actuarial Valuation as of June 30, 1989; Vol. 2, p. 245-247, FRS Actuarial Valuation as of June 30, 1990; Vol. 2, p. 273-275, FRS Actuarial Valuation as of June 30, 1991; Vol. 2, p. 300-302, FRS Actuarial Valuation as of June 30, 1992; Vol. 2, p. 328-330, FRS Actuarial Valuation as of June 30, 1993; Vol. 2, p. 368-370, FRS Actuarial Valuation as of June 30, 1994; [the FRS Actuarial Valuation as of June 30, 1995 is missing the page detailing the present value of future contributions]; Vol. 3, p. 437-439, FRS Actuarial Valuation as of June 30, 1996; Vol. 3, p. 544-546, FRS Actuarial Valuation as of June 30, 1997; Vol. 3, p. 584-586, FRS Actuarial Valuation as of June 30, 1998; Vol. 3, p. 626-628, FRS Actuarial Valuation as of June 30, 1999; Vol. 4, p. 667, 669, 671, FRS Actuarial Valuation as of June 30, 2000; vol. 4, p. 709-711, FRS Actuarial Valuation as of June 30, 2001; Vol. 4, p. 748-750, FRS Actuarial Valuation as of June 30, 2002.
[128] See Vol. 4, p. 798.
[129] These increases were anticipated in the FRS Actuarial Valuation as of June 30, 1989:

In the event that additional groups of firefighters are merged into the system, changes in the employer funding requirements will potentially arise from two sources. First, any merger completed in which the assets merged are less than the accrued liabilities assumed will result in an increase in the unfunded accrued liability for the Firefighters' Retirement System. The resulting amortization payments will be shared by all contributing employers. For every increase of $1,000,000 in the system's unfunded accrued liability, annual employer payments will increase $77,906 for each of the next 30 years with this amount to be shared by all employers in proportion to the amount of their covered payroll for participating members. Secondly, any merger produces an additional increase in costs by spreading the current funding excess credit over a larger payroll base and reducing the benefit to current employers. The current credit is $19,032. Any merger will divide this credit among a larger group of employers. However, since the credit itself is small relative to required contribution, the effect of this "dilution" of the credit is not significant. See Vol. 2, p. 211.
[130] See Vol. 13, p. 2283-2284.
[131] La. R.S. 11:2260(A)(2)(c) and (d).
[132] See La. R.S. 24:513(C)(1).
[133] See Vol. 1, p. 81, Legislative Audit Report on FRS, November 20, 2002.
[134] Written Reasons for Judgment, Vol. 10, p. 1960-1961; Judgment, Vol. 10, p. 1965. After finding these acts unconstitutional, the trial judge additionally concluded that La. R.S. 11:103 and 104 were unconstitutional as applied to the FRS. For the reasons expressed in this opinion, that finding is found to be legally and factually erroneous.
[135] In its First Amending and Supplemental brief, the FRS argues the plaintiffs failed to show there was an immediate threat necessary for injunctive relief, although there was testimony regarding the possibilities of many things, i.e. reduction of other municipal services, that may happen if municipalities pay the required employer contribution rate. We note parenthetically that some of the witnesses for the plaintiffs testified that the employers were paying the increased employer contribution rates, that whether the employers were paying the increased employer contribution rates was a discretionary budgetary consideration, and that some of the employers which were not paying the increased FRS employer contribution rate were nevertheless paying the increased employer contribution rate for the Municipal Police Employees' Retirement System, which has also increased, although not as much as the FRS. The dissent by Justice Knoll finds that our statutory interpretation, which holds that any shortfall in the funding of the FRS be covered by an increase in the employers' contribution rate, leads to absurd consequences. We find nothing absurd in the legislature's apparent decision to expect the municipal and fire district employers to bear an increased responsibility to a retirement system for their own employees.
[136] Based on the court's conclusion that all of the statutes and legislative acts at issue are constitutional, the two remaining assignments of error raised by the state โ regarding (1) the necessity of joinder of the State Police Pension and Retirement Systems and the Sheriffs' Pension and Relief Fund as parties for adjudication of the constitutionality argument and (2) the correctness of the district court's motion in limine preventing Mr. Curran from offering testimony at the joinder hearing โ are pretermitted as unnecessary for consideration. Similarly, we pretermit as unnecessary discussion of an additional assignment of error raised by the FRS in its First Amending and Supplemental brief regarding the district court's sustaining an objection to the testimony of FRS witness Kelli Chandler, the FRS staff CPA, regarding inferences she drew based on the declining numbers of employers who were then paying the full employer contribution rate, including the effect of a preliminary injunction on the FRS' cash flow.
[1] Generally, this group includes municipalities and various fire districts.
[2] The contribution of the firefighters' employers has increased from nine percent for all years prior to 2002, to 25.25 percent of payroll in 2003.
[1] In its cross-claim, the FRS stated:

AND NOW, while reserving all rights accorded to its position as defendant and reasserting the admissions, denials, and allegations set forth herein above in Paragraph Nos. 1 through 46, inclusive, [FRS] does simultaneously assume the position of cross-claimant against the State of Louisiana. For purposes of this cross-claim only, FRS does hereby adopt by reference and assert all allegations set forth in Paragraph Nos. 1 through 103, inclusive, of petitioners, Amended and Restated Petition, except Paragraph Nos. 99, 100, and 101 thereof. FRS does hereby pray for all contributions and interest that are owed to FRS as a result of the matter that is made the subject of petitioners' Amended and Restated Petition. Additionally, FRS assumes the position of cross-claimant against the state for all amounts due to FRS as set forth more fully below.